**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARY ESPOSITO, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JOSEPH A. CARLUCCI, JONATHAN L. WILCOX, and SYED T. KAMAL,<br><br>Defendants. | Civil Action No.: **16-cv-11797**<br><br>**ECF Case**<br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Mary Esposito ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding American Renal Associates Holdings, Inc. ("ARA" or the "Company"), analyst reports and advisories about the Company, documents filed in *UnitedHealthcare of Florida, Inc. v. American Renal Associates Holdings, Inc.*, 9:16-cv-81180 (S.D. Fla), and information readily

obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired ARA securities pursuant to a Registration Statement or on a U.S. stock exchange between April 20, 2016 and August 18, 2016, both dates inclusive (the "Class Period") seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      ARA, a provider of outpatient dialysis services, owns and operates approximately 200 dialysis clinics throughout the country.   According to its website, "ARA operates exclusively through a physician partnership model, in which it partners with 369 local nephrologists to develop, own and operate dialysis clinics."

3.      Medicare and Medicaid are social health care programs pursuant to which the government subsidizes an eligible patient's medical treatment.   Eligible patients for these programs are often elderly, of limited financial means, or both.   Providers of dialysis services such as ARA provide treatment to patients enrolled in Medicare or state Medicaid programs as well as patients enrolled in private health insurance plans.   However, private insurance plans reimburse dialysis providers at significantly higher rates than Medicare or Medicaid.   For example, a procedure with a Medicare or Medicaid reimbursement rate of approximately $200 will receive an out of network reimbursement rate of approximately $4,000 from a private insurer.

4.      Thus, in order for ARA to operate at a profit, ARA heavily depends on revenues derived from private insurance payors.

5.      Prior to and during the Class Period, ARA engaged in a course of conduct designed to place patients who were already eligible to receive dialysis through Medicare or Medicaid into private insurance for the sole purpose of increasing ARA's reimbursement rates. ARA accomplished this "revenue enhancement" practice through an illicit practice of funding the American Kidney Fund ("AKF"), a third party charitable 501(c)(3) payor, to pay private insurance premiums.  Significantly, AKF only funded insurance for dialysis (from which ARA would benefit) and did not fund other treatments for patients with end-stage renal disease ("ESRD"), such as kidney transplants (from which ARA would not benefit).  Similarly, ARA's practice of encouraging patients to enroll in private insurance was predominantly in locations that lacked competitive "in network" dialysis centers, so that ARA would be paid out-of-network rates for these patients.

6.      On April 22, 2016, ARA filed its Prospectus for its initial public offering ("IPO"), which forms part of the Registration Statement that became effective on April 20, 2016. Pursuant to the IPO, 8,625,000 shares of ARA were sold at a price of $22.00 per share ($20.51 per share net of underwriting discounts), raising approximately $176.9 million in net proceeds for the Company. ARA used $165.6 million of the net proceeds from the IPO in order to, among other things, repay outstanding amounts under its second lien credit facility.

7.      The Prospectus represented that ARA (1) maintained "[r]obust compliance" and "[a]dherence to stringent billing, reimbursement and compliance procedures" and (2) that it "follow[s] a disciplined approach to enhancing performance" in "payor interaction and arrangements; and billing and collection."  The Prospectus also issued a boilerplate "risk factor"

that "it is possible that some of our business activities could be subject to [anti-kickback] laws." These statement were materially false and misleading because, unbeknownst to investors, ARA was actively steering vulnerable patients from Medicare and Medicaid into the private market by use of a self-funded charity, for the sole purpose of collecting larger reimbursements. Far from being a faint possibility, ARA's business and billing practices created a material risk that ARA would be found to have violated anti-kickback laws. Yet, nowhere in ARA's disclosures did it inform investors that certain of its revenue was derived from insurance plans in which an industry-funded not-for-profit entity was improperly paying for patients' premiums. In fact, the not-for-profit entity at the heart of ARA's revenue-generating scheme—AKF—was never identified in the Prospectus.

8.      Defendants continued their misrepresentations when, during a May 13, 2016 earnings call, an ARA officer attributed increased revenue to patients "opting for an ACA ['Affordable Care Act'] product," which conveyed the misleading impression that patients chose these plans of their own volition, rather than as a result of ARA's and AKF's prodding and enticement.

9.      Based on Defendants' false statements, ARA stock price soared, reaching $29.65 per share on June 13, 2016, more than $7.00 higher than ARA's IPO price of $22 a share.

10.      On July 1, 2016, following the close of the market, news broke that three affiliates of the insurer UnitedHealth Group Inc. ("UnitedHealth") had commenced suit against ARA. In its complaint, UnitedHealth alleged that, beginning in the first quarter of 2016, ARA had engaged in a "fraudulent and illegal scheme," in violation of various state anti-kickback and insurance fraud statutes, in which ARA convinced Medicare and Medicaid-eligible patients to enroll in UnitedHealth plans by referring them to AKF, which would pay for their insurance

premiums.  ARA engaged in this scheme, the complaint alleged, because UnitedHealth's out-of-network reimbursement rate dwarfed the rates for Medicaid and Medicare.

11.    On July 5, 2016 (the first day of trading since the news broke), and prior to the opening of the U.S. securities market, Defendants issued a Form 8-K acknowledging that it had received the UnitedHealth complaint.  By the close of the market on July 5, 2016, ARA shares had declined $2.82 per share or nearly 9.88%, to close at $25.71 per share.

12.    Consistent with the revelations from the UnitedHealth lawsuit, on July 27, 2016, an executive for another health insurer, Anthem, Inc., reported on an earnings call of "higher than-expected payments for dialysis treatments during the first half of the year" and that Anthem was "in the process of reviewing the drivers of this increase."  By the close of the market on July 27, 2016, ARA shares had declined by $2.18 per share, or approximately 8.2%, to close at $24.41 per share.

13.    During an August 10, 2016 earnings call, ARA's Chief Executive Officer, Defendant Joseph A. Carlucci, attempted to downplay the significance of the UnitedHealth lawsuit, claiming that the challenged practice affected only 27 UnitedHealth patients.

14.    Despite these assurances, on August 18, 2016, news broke that the Centers for Medicare and Medicaid Services ("CMS") had launched an investigation into whether dialysis centers participating in Medicare, such as ARA, were "steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates" and that CMS was considering penalties for providers engaged in such conduct, which it deemed "inappropriate."  On this news, ARA shares declined $2.31 per share or nearly 10.44%, to close at $19.81 per share on August 19, 2016.

15.     During the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about ARA's business practices and financial condition.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants maintain an office in this District, and many of the acts and omissions complained of herein occurred in substantial part in this District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

21.     Plaintiff, as set forth in the attached certification, purchased ARA shares at artificially inflated prices during the Class Period and has been damaged thereby.

22.     Defendant American Renal Associates Holdings, Inc. is a Delaware corporation with principal executive offices located at 500 Cummings Center, Suite 6550, Beverly, Massachusetts 01915.   ARA's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ARA."

23.     Defendant Joseph A. Carlucci ("Carlucci") is the Chief Executive Officer ("CEO") and Chairman of the Board of ARA.

24.     Defendant Jonathan L. Wilcox ("Wilcox") is the Chief Financial Officer ("CFO") and a vice president of ARA.

25.     Defendant Syed T. Kamal ("Kamal") is the President and a director of ARA.

26.     Defendants Carlucci, Wilcox, and Kamal are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     Defendants' Materially False and Misleading Statements in the Offering Documents

27.     On or about April 20, 2016, ARA filed with the SEC an amended Form S-1/A Registration Statement (the "Registration Statement") that incorporated a prospectus to be used in connection with the offer and sale of ARA shares. The Registration Statement contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

28.     The Registration Statement was signed by the Individual Defendants pursuant to a power of attorney on April 20, 2016.

29.     On or about April 22, 2016, ARA filed the final version of the public offering prospectus for the IPO, which forms part of the Registration Statement that became effective on

April 20, 2016 (collectively, the "Offering Documents").  The Prospectus solicited investors for

an IPO of 8,625,000 shares of ARA common stock (including the over-allotment option) at a

price of $22.00 per share, for proceeds to the Company of approximately $176,900,000.

30.     The Offering Documents represented the following, in relevant part:

 We are the largest dialysis services provider in the United States focused
exclusively on joint venture partnerships with physicians. We provide high-
quality patient care and clinical outcomes to patients suffering from the most
advanced stage of chronic kidney disease, known as end stage renal disease
("ESRD"). Our core values create a culture of clinical autonomy and operational
accountability for our physician partners and staff members. We believe our joint
venture ("JV") model has helped us become one of the fastest-growing national
dialysis services platforms, in terms of the growth rate of our non-acquired
treatments since 2012.

*        *        *

Exclusive Focus on the JV Model Delivers Compelling Value Proposition for
Patients, Physicians and Payors

 We believe our results reflect the compelling value proposition of our JV model:

For Patients

     …

• Continuity of care:  Continuity of care and consistent experience supported
  by minimal voluntary turnover of nephrologists and clinicians

For Physicians

     …

• Experienced managerial and operational support:  For key functions such
  as clinical and technical services, **billing, collections, payor contracting,
  regulatory and compliance**

• Proactive education to patients of physicians: **On insurance coverage to
  help alleviate cost and scope of coverage concerns**

     …

For Payors

• Cost containment:  Provide high-quality care in an outpatient setting

• Quality care:  Consistent high-quality clinical outcomes

- **Robust compliance: Adherence to stringent billing, reimbursement and compliance procedures**

*    *    *

Our Growth Strategy

We believe our focus on the JV model, our core values and the strength of our experienced management team have driven the growth in our patient population and physician relationships, and position us to execute on the following growth strategies.

…

Deliver on Our Core Values with Best Practices Management Services

We intend to continue to focus on providing high-quality patient care, clinical autonomy to physicians and extensive professional, operational and managerial support to our clinics through management services arrangements. Based on our experience in the dialysis services industry, **[W]e will continue to follow a disciplined approach to enhancing performance in key areas such as: revenue cycle management; patient registration; facilitation and verification of insurance; payor interaction and arrangements; and billing and collection.** We believe this has positively impacted our revenue per treatment and allowed us to maintain low levels of days' sales outstanding and bad debt expense. In addition, we believe our management services reduce the burden of back-office management responsibilities associated with the daily operations of a dialysis clinic and enable our physician partners to focus on providing high-quality patient care. As a result, we consistently deliver high-quality clinical outcomes.

(Bolded and underlined emphasis added).

31.     Defendants also identified the following "Risks Related to Our Business":

We depend on commercial payors for reimbursement at rates that allow us to operate at a profit.

**Commercial payors pay us at rates that are generally significantly higher than Medicare rates and the rates paid by other government-based payors such as state Medicaid programs. For the three years ended December 31, 2015, we derived on average approximately 40% of our patient service operating revenues from commercial payors, including for non-contracted providers, even though commercial payors were the source of reimbursement for on average approximately 13% of the treatments performed during the three years ended December 31, 2015.** Medicare rates are generally insufficient to cover our total operating expenses allocable to providing dialysis treatments for

Medicare patients. **As a result, our ability to generate operating earnings is substantially dependent on revenues derived from commercial payors, some of which pay negotiated payment rates and others of which pay based on our usual and customary fee schedule.** To the extent the proportion of commercial payors decreases relative to government payors as a source of reimbursement for treatments, it would have a material adverse effect on our revenues, operating results and cash flows.

*        *        *

If we fail to adhere to all of the complex federal, state and local government regulations that apply to our business, we could suffer severe consequences that could adversely affect our operating results and financial condition.

Our dialysis operations are subject to extensive federal, state and local government regulations, all of which are subject to change. These government regulations currently relate, among other things, to:

- government healthcare program participation requirements;

- **requirements related to reimbursement for patient services, including Medicare and Medicaid reimbursement rules and regulations**, rules addressing the priority of payors, signature and documentation requirements, and coding requirements;

- **federal and state anti-kickback laws, the federal physician self-referral prohibition statute (the "Stark Law") and analogous state physician self-referral statutes;**

- **false claims prohibitions for healthcare reimbursement programs and other fraud and abuse laws and regulations**, including the federal False Claims Act, a provision in the ACA extending the federal False Claims Act to include, under certain circumstances, claims based on violations of the federal anti-kickback law, and other civil monetary penalty laws, **including laws prohibiting offering or giving remuneration to any beneficiary of a federal healthcare program that such person knows or should know is likely to influence the beneficiary to order or receive any item or service reimbursable under such program;**

…

**<u>Because of the breadth of these laws and the strict requirements of the statutory exceptions and safe harbors available, it is possible that some of our business activities could be subject to challenge under one or more of such laws. …</u>**

(Bolded and underlined emphasis added).

32.    The underlined statements in paragraphs 30-31 above were materially false and/or misleading because they misrepresented and failed to disclose the adverse facts, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants claimed that ARA maintained "[r]obust compliance" and "[a]dherence to stringent billing, reimbursement and compliance procedures" and that it "follow[s] a disciplined approach to enhancing performance" in "payor interaction and arrangements; and billing and collection."

33.    Defendants also made the misleading and incomplete representation that "it is possible that some of our business activities could be subject to [anti-kickback] laws" which misled investors because it failed to disclose that ARA's core business model, and a significant portion of the Company's revenues, were, in fact,  dependent on unethical and/or illegal business practices.

34.    The above-described statements were materially false and misleading because ARA had been illicitly funding  AKF as part of a plan to steer Medicaid and Medicare-eligible patients into the private insurance market –  for the sole purpose of increasing its reimbursement rates.  This unethical and reckless practice left the Company vulnerable to both civil and potentially criminal liability pursuant to, among other things, anti-kickback and insurance fraud statutes.

**B.     Defendants' Materially False and Misleading Statements Regarding ARA's Revenues and Business Model**

35.    Defendants also omitted material facts from investors when it failed to inform them that a large portion of its revenue was derived from insurance plans in which an industry-funded not-for-profit entity was improperly paying for patients' premiums.  In fact, AKF, the not-for-profit at issue, was never mentioned in any SEC filing.

36.    On May 12, 2016, prior to the opening of U.S. securities markets, the Company issued a press release announcing its financial results for the second quarter ended March 31, 2016.   For the quarter, the Company reported that net patient service operating revenues increased 15% to $172.1 million, and that adjusted EBITDA less non-controlling interests ("Adjusted EBITDA-NCI") increased 9% to $27.2 million.   Net income attributable to ARA increased 31% to $3.8 million, and total dialysis treatments increased 15%.

37.    On an earnings call the next day, John McDonough, ARA's Chief Operating Officer, attributed the increase in revenue to the increase of patients signing up for Affordable Care Act ("ACA") plans:

> And I'll start with the first part on the revenue side, and what I can comment on the revenue side, year-over-year we saw about a $1.50 increase on a per treatment on revenue per treatment. And as Jon noted, ***that was mainly driven by commercial mix. In the underlying of that is, we've seen some more patients covered under ACA plans as we go into the first quarter. And that's good for patients because these are patients that would not have been – would not maybe have insurance coverage or has better insurance coverage under an ACA plan than the alternative. So that's been good for patients, and that's really been the driver of our increase in our revenue per treatment year-over-year.***
>
> *       *       *
>
> As Jon mentioned off in his prepared remarks is that we have seen a slight improvement in payer mix, and as I just said, the underlying –*] **what we see is patients opting for an ACA product,** and those are patients that previously maybe wouldn't be covered under an insurance or a plan or the ACA has offered them better coverage than their alternative.

38.    The implication of the above statement, was, of course, that patients had "opted" for ACA plans on their own initiative.  This was false, as many patients had opted for this choice only after ARA successfully induced them to sign up, utilizing AKF to pay their premiums.

39.    On May 16, 2016, the Company filed a quarterly report for the period ended March 31, 2016 on a Form 10-Q with the SEC, signed by, Defendant Wilcox, which reiterated the Company's previously announced financial results and financial position.  In addition, the

Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")

by Defendants Carlucci and Wilcox, stating that the financial information contained in the Form

10-Q was accurate and disclosed any material changes to the Company's internal control over

financial reporting.

### The Truth Emerges

40.     On July 1, 2016, UnitedHealth commenced an action in the United States District

Court of the Southern District of Florida against ARA (No. 9:16-cv-81180-KAM) alleging that

ARA fraudulently billed UnitedHealth for millions of dollars since the beginning of the year.

Specifically, the complaint alleged:

> 1. This action involves a fraudulent and illegal scheme by ARA – one of the country's largest providers of dialysis services – to unlawfully obtain benefit payments from United for dialysis services rendered to vulnerable patients suffering from chronic kidney disease.

> 2. ARA has directed its deceptive conduct at United and United's commercial health insurance plans, and has caused United to make substantial payments to ARA that United would not have made had ARA acted truthfully and lawfully. *ARA has preyed upon some of Florida's and Ohio's most vulnerable patients – ones suffering from end-stage renal disease ("ESRD") – converting them from patients to pawns in a scheme to maximize ARA's profits.*

> 3. *In fact, since the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans.*

> 4. The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.

> 5. Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).

> 6. ARA is an out-of-network provider, rather than an "in-network" provider, for United's commercial plans. This means ARA does not have a contractually agreed upon rate for dialysis services rendered to patients insured under those plans. As an out-of-network provider, ARA believes it can bill United at rates that

are as much as twenty times the rates it would receive from Medicaid and/or Medicare. As described below, ARA's out-of-network status has made United's commercial plans a particularly attractive target for ARA's scheme.

7. Knowing of its out-of-network status with United plans, and believing that it can bill United more than $4,000 *for the same services* being rendered to Medicaid and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.

8. To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.

9. The solution ARA implemented was deceptive, fraudulent, and illegal.

10. *First*, **ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose.**

11. *Second*, **ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—i.e., plans that would result in the highest out-of-network reimbursement to ARA.**

12. *Third*, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA.

13. **Patients suffered in two ways as a result of ARA's scheme. First, upon information and belief, ARA intentionally failed to inform patients that AKF's premium assistance program was only available for patients receiving dialysis treatments and, consequently, none of the patients knew that they would be ineligible for premium assistance if they sought to cure their condition through a kidney transplant. Second, while ARA illegally agreed to waive the copays, coinsurance and deductibles patients owed to it, it could not guarantee that the**

*patients' doctors, pharmacists, medical equipment suppliers, and other service
providers would similarly break the law by doing the same.*

14. ARA's actions violated several important criminal and civil laws, including
Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. §
817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's Anti-
Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade
Practices Act (Fla. Stat. § 501.201 et seq.) ("FDUTPA").

15. *Because ARA used unlawful means to move vulnerable ESRD patients onto
commercial United plans, the services and treatments ARA provided to these
patients after it implemented its scheme were not lawful when rendered and
were, therefore, ineligible for reimbursement.*

16. United has already paid millions of dollars in benefits to ARA for claims
ARA submitted as part of its illegal and unethical conversion and billing scheme.

(Emphasis added).

41.     Thus, ARA specifically targeted those patients who lived in areas that were not

serviced by in-network UnitedHealth dialysis facilities, where UnitedHealth would have no

choice but to pay ARA's inflated out-of-network charges.  ARA's business practices of targeting

patients already on dialysis (with pre-existing conditions) into UnitedHealth insurance policies,

skewed the insured patient population and made it impossible for UnitedHealth to establish

premiums based on its assessment of the general population's need for dialysis.  In this manner,

ARA's fraudulent practices increased health care costs for all insured patients.

42.     While UnitedHealth sued only for payments made on behalf of Ohio and Florida

patients, it made clear that "ARA's scheme does not appear to be limited to Ohio and Florida,"

noting that the California Department of Managed Health Care recently sought further

information from UnitedHealth regarding out-of-network requests submitted for outpatient

dialysis performed by an ARA subsidiary.  ¶¶ 109-13.

*43.*     The lawsuit was picked up after the close of market on Friday, July 1, 2016 by

*The New York Times* and *The Wall Street Journal.  The New York Times* observed that "[k]idney

transplants, rather than dialysis, are seen as the best options for most patients with end-stage

renal disease, but the American Kidney Fund does not pay for premiums after patients receive a

kidney transplant. Patients were not informed of that."  In other words, AKF would not pay for

premiums once a patient became less profitable to its donors in the dialysis industry.

Specifically, *The New York Times* noted that AKF:

> has close ties to the dialysis industry: It acknowledges that dialysis companies pay
> for its premium-assistance program, and in 2015, 78 percent of its $264 million in
> revenue came from two companies, according to its financial disclosures. The
> kidney fund declined to name the companies. The organization's chairwoman is a
> former executive at DaVita and Fresenius Medical Care, the nation's two leading
> dialysis chains.
>
> Those industry ties expose the profit motive that underpins the programs,
> according to Patrick Burns, executive director of Taxpayers Against Fraud, a
> whistle-blower advocacy group.
>
> 'There is a bottom line here, and the people who manage these programs are well
> aware of it, on both sides,' he said.

44.     On July 5, 2016 (the first day of trading since the news broke), and prior to the

opening of the U.S. securities market, Defendants issued a Form 8-K, which stated as follows:

> On July 1, 2016, American Renal Associates Holdings, Inc. (the "Company")
> received a complaint filed by three affiliates of UnitedHealth Group Inc. ("United")
> in the United States District Court of the Southern District of Florida. The
> complaint relates to 27 patients who have received dialysis at 12 ARA facilities in
> Florida and Ohio and who elected to receive coverage under one of United's
> Affordable Care Act ("ACA") insurance products, effective on or after January 1,
> 2016. At this time, approximately 33 patients across 15 clinics in 5 states with
> United ACA products receive dialysis care at the Company's facilities. The
> complaint identifies approximately $1.9 million of payments made to 12 of the
> Company's facilities that United claims were improper. The complaint seeks
> monetary damages and injunctive relief. The Company believes this lawsuit is
> without merit. The Company intends to vigorously defend itself in this legal matter;
> however, no assurance can be given as to the timing or outcome of this matter, or
> can any assurance be given as to whether the filing of this lawsuit will affect the
> Company's other relationships, or the Company's business generally. The
> Company's top priority continues to be providing the highest quality care to
> patients that choose to receive dialysis services at the Company's facilities.

45.     By the close of the market on July 5, 2016, ARA shares declined $2.82 per share or nearly 9.88%, to close at $25.71 per share.

46.     On July 26, 2016, as subsequently disclosed in ARA's August 9, 2016 quarterly filing, the SEC sent a letter to ARA stating it was conducting an inquiry and requesting that the Company provide certain documents and information relating to the subject matter covered by the UnitedHealth complaint.

47.     The decrease in ARA's stock price was further exacerbated when John Gallina, the CFO of the health insurer Anthem, Inc. reported on a July 27, 2016 earnings call that

> ***We have experienced higher-than-expected payments for dialysis treatments during the first half of the year, which we are in the process of reviewing the drivers of this increase.*** All in, our updated outlook now expects the individual ACA-compliant business to incur mid single-digit operating margin losses for the 2016 benefit year.

(Emphasis added)

48.     By the close of the market on July 27, 2016, ARA shares had declined by $2.18 per share, or approximately 8.2%, to close at $24.41 per share.   An analyst at Barclays Capital Inc. noted that Anthem's comments "further exacerbated" ARA's underperformance, initially caused by revelations in the UnitedHealth lawsuit.

49.     During an ARA earnings call held on August 10, 2016, Defendant Carlucci attempted to downplay the significance of the UnitedHealth lawsuit by stating that ARA had been made aware of the claims and had previously reserved for the claims (albeit without advising investors of the claims):

> Point number one, the number of patients and the revenue recorded in connection with United ACA products ***are immaterial to the Company's financial statements. As we disclosed previously in an 8-K on July 5th, after the complaint was filed, there are only approximately 33 patients who chose United ACA plans across all of ARA's clinics, and the complaint relates to 27 of these patients. [5]***

17

ARA has previously established contractual allowances for United's ACA products. In addition, of the $1.9 million in payments listed in the lawsuit, prior to the lawsuit, based in part on contract discussions with United, ARA had reserved a significant amount as a payer-refund liability on its balance sheet, and therefore, we believe the exposure to be immaterial.

50.     Defendant Carlucci also acknowledged that ARA had funded AKF, the entity

used to pay ARA's patients' private insurance premiums:

ARA is proud of the work that the American Kidney Fund does for dialysis patients. ***We, along with others in our industry, make charitable contributions to the American Kidney Fund, and we think nonprofit organizations like the American Kidney Fund do amazing work by helping needy dialysis patients.*** We think their activities are firmly on the right side of public policy.

At ARA, we believe chronically ill, very sick patients with many comorbidities should always be treated with dignity and respect, and should always have access to quality healthcare. Patients who choose the ACA plans to cover their care should not be looked down upon if a charitable organization determines necessary funding is appropriate.

At ARA, we will continue to fight for these patients and ensure that they receive excellent care at our clinics or others, so they are allowed to travel outside the state they live in, ***so they are allowed to be placed on transparent [sic] waiting lists***, and so there are allowed to continue their entitlements through Medicaid if they wish to retain that as a secondary insurance.

It is a core value at ARA to advocate for each and every patient that chooses us for their care, and we will see to it that the care they receive is unmatched in terms of quality, convenience, and provided with dignity; that's what we stand for at ARA.

51.     Contrary to Defendant Carlucci's statements, there is no reason to believe that

ARA's practice of diverting Medicare and Medicaid patients to private insurers was limited to

UnitedHealth plans.  Indeed, Anthem's earlier statements, as well as CMS's announcement that

it would soon send warning letters to all Medicare-participating dialysis centers, suggest that the

practice was prevalent throughout the industry, and targeted other health insurance plans.

52.     On August 18, 2016, following the close of the markets, news outlets reported

that the CMS had issued a "Request for Information" concerning "Inappropriate Steering of

Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market

Plans." Specifically, CMS sought public comment:

> regarding concerns about health care providers and provider-affiliated
> organizations steering people eligible for or receiving Medicare and/or Medicaid
> benefits to an individual market plan for the purpose of obtaining higher payment
> rates. CMS is concerned about reports of this practice and is requesting comments
> on the frequency and impact of this issue from the public. ***We believe this practice
> not only could raise overall health system costs, but could potentially be harmful
> to patient care and service coordination because of changes to provider networks
> and drug formularies, result in higher out-of-pocket costs for enrollees, and
> have a negative impact on the individual market single risk pool (or the
> combined risk pool in states that have chosen to merge their risk pools).*** We are
> seeking input from stakeholders and the public regarding the frequency and impact
> of this practice, and options to limit this practice.

(Emphasis added).

53. *The Wall Street Journal* reported on this news in an August 18, 2016 article,

issued after the close of the U.S. markets, entitled "U.S. Opens Probe Into Concerns Over

Health-Provider Payments," which mentioned the UnitedHealth lawsuit, and in pertinent part,

reported:

> WASHINGTON -- The Obama administration has launched a probe into whether
> healthcare providers such as dialysis centers are steering patients eligible for
> Medicare and Medicaid benefits into insurance plans offered on the health law's
> exchanges.
>
> The Centers for Medicare and Medicaid Services on Thursday said it sent warning
> letters to all dialysis centers that participate in the federal Medicare program. The
> agency also said it is weighing financial penalties on providers who are found to
> have directed people eligible for Medicare into Affordable Care Act plans instead.
>
> "We are concerned about reports that some organizations may be engaging in
> enrollment activities that put their profit margins ahead of their patients' needs," said
> CMS Acting Administrator Andy Slavitt in a news release.
>
> The agency said it was examining "concerns that some health care providers and
> provider-affiliated organizations may be steering people" who are eligible for
> Medicare or Medicaid into ACA plans.

The concern, according to the CMS, is that health-care providers or organizations affiliated with them may be paying insurance premiums for patients who would otherwise qualify for Medicare and Medicaid. This would allow the patients to instead get coverage on the ACA exchanges from insurance companies that offer the providers higher reimbursement rates than are given under the federal health programs.

"There is a direct conflict of interest for providers to pay patients' premiums with the sole intent of increasing their own reimbursement," said Clare Krusing, a spokeswoman at America's Health Insurance Plans, an industry trade group.

***Concerns by some insurers over the potential practice have spurred legal action. In July, UnitedHealth Group Inc. sued kidney-care chain American Renal Associates Holdings Inc., accusing it of fraud. The lawsuit said American Renal Associates engaged in a "fraudulent and illegal scheme" to get larger payments from the insurer by persuading patients to sign up for UnitedHealth plans and connecting them with a charity, American Kidney Fund, that helped pay their premiums.***

54.     The article also reported on possible monetary penalties for offenders:

***CMS said it is also considering actions, including banning or limiting premium payments for ACA plans by health-care providers and changes to Medicare and Medicaid provider enrollment rules.***

***The agency said it is weighing civil monetary penalties*** on health-care providers if their actions cause Medicare-eligible patients to suffer penalties for signing up late to the federal program because they were steered into an ACA exchange plan.

The Obama administration said it is concerned that the payment arrangements also may be steering sicker patients onto ACA plans, skewing the population to consumers who are more expensive for insurers. Some insurers have withdrawn or curtailed participation on the exchanges, which is where consumers go to obtain coverage and qualify for subsidies, citing higher-than-expected costs of covering patients who are older or sicker than they expected.

(Emphasis added).

55.     On this news, ARA shares declined $2.31 per share or nearly 10.44%, to close at

$19.81 per share on August 19, 2016.

## Defendants' Actions Violated both the
## Federal Securities Laws and SEC Regulations

56.     Item 303 of the SEC Regulation S-K requires registrants to "[d]escribe any known trends or uncertainties … that the registrant reasonably expects will have a material … unfavorable impact or would cause reported financial information not to be necessarily indicative of future operating results or of further financial condition."

57.     Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. Section 229.303(a) instruction 3.

58.     The facts misrepresented or omitted in the Prospectus and first and second quarter Form 10-Qs, as alleged herein, constituted known trends or uncertainties that Defendants reasonably expected would have a material unfavorable impact on net sales or revenues or income from continuing operations.

59.     The Prospectus's and Form 10-Qs' generic cautionary language was incomplete and did not fulfill Defendants' duty to inform the investing public of the particular, factually-based uncertainties of which it was aware at the time of the IPO.

60.     Defendants had actual knowledge or were recklessly indifferent to the true facts regarding the ARA's business model and source of revenues.  Among other things, the Defendants' scheme required that ARA make contributions to AKF, which were earmarked for ARA patients with low reimbursement rates for dialysis treatments (and not for transplants), and in areas where there were no competitive in-network facilities.  Moreover, Defendants were aware of UnitedHealth's claims prior to the IPO and determined to reserve for those claims on

ARA's first quarter financial statements (without disclosing the substantive basis for those reserves).

61.     The Individual Defendants, senior officers in the health care field, knew or must have known that funding charitable entities such as AKF and using those entities to pay insurance premiums for patients otherwise eligible for federal programs, would draw attention from federal regulators and expose the Company to civil and potential criminal liability  Thus, Defendants knowingly withheld material facts from investors, both in the Prospectus for the IPO, and in their financial statements during the Class Period.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired ARA shares during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of ARA, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Individual Defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ARA shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' actions as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business model and prospects of ARA;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading

- whether the Defendants caused ARA to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ARA shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- ARA shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- As a public issuer, ARA filed periodic public reports with the SEC;

- ARA regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- ARA was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

69.     Based on the foregoing, the market for ARA shares promptly digested current information regarding ARA from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against ARA and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the Class Period, ARA and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     ARA and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ARA common stock during the Class Period.

74.     ARA and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of ARA were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of ARA, their control over, and/or receipt and/or modification of ARA's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning ARA, participated in the fraudulent scheme alleged herein.

75.     The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when they failed to ascertain and

disclose the true facts in the statements made by them or other ARA personnel to members of the investing public, including Plaintiff and the Class.

76.     As a result of the foregoing, the market price of ARA common stock was artificially inflated during the Class Period. In ignorance of the falsity of the statements by ARA and the Individual Defendants, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ARA securities during the Class Period in purchasing ARA common stock at prices that were artificially inflated as a result of ARA and the Individual Defendants' false and misleading statements.

77.     Had Plaintiff and the other members of the Class been aware that the market price of ARA common stock had been artificially and falsely inflated by ARA and the Individual Defendants' misleading statements and by the material adverse information which ARA and the Individual Defendants did not disclose, they would not have purchased ARA securities at the artificially inflated prices that they did, or at all.

78.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

79.     By reason of the foregoing, ARA and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ARA common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     During the Class Period, the Individual Defendants participated in the operation and management of ARA, and conducted and participated, directly and indirectly, in the conduct of ARA's business affairs.  Because of their senior positions, they knew the adverse non-public information about ARA's misstatement of income and expenses and false financial statements.

82.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ARA's financial condition and results of operations, and to correct promptly any public statements issued by ARA which had become materially false or misleading.

83.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ARA disseminated in the marketplace during the Class Period concerning ARA's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ARA to engage in the wrongful acts complained of herein.  The Individual Defendants were "controlling persons" of ARA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ARA.

84.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ARA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

27

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 2, 2016                                    **BERMAN DEVALERIO**

                                                           */s/ Mark A. Delaney*
                                                           Leslie R. Stern (BBO #631201)
                                                           Mark A. Delaney (BBO #652194)
                                                           One Liberty Square
                                                           Boston, MA 02109
                                                           Telephone:  (617) 542-8300
                                                           Facsimile:  (617) 542-1194
                                                           lstern@bermandevalerio.com
                                                           mdelaney@berrmandevalerio.com


                                                           **WOLF POPPER LLP**
                                                           Robert C. Finkel
                                                           845 Third Avenue
                                                           New York, NY 10022
                                                           212-759-4600

                                                           *Counsel for Plaintiff and the
                                                           Putative Class*

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Mary Esposito, hereby state:

1.      I have reviewed a complaint against American Renal Associates Holdings, Inc. ("ARA") and certain of its officer(s) and have authorized the filing of a complaint on my behalf.

2.      I am willing to serve as a representative party on behalf of the Class, as defined in the above referenced complaint, including providing testimony at deposition and trial, if necessary.

3.      The following includes all of my transactions in ARA securities during the period *4/22/16 to date*

| Date | Type | Quantity | Price Per Share |
|------|------|----------|-----------------|
| 4/22/16 | Buy | 500 | $27.02 |
| 4/22/16 | Buy | 500 | $27.02 |
| *7/5/16* | Sale | 300 | $26.17 |
| *7/5/16* | Sale | 300 | $26.17 |

4.      I did not purchase these shares at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5.      During the three-year period preceding the date of signing this certification, I have not sought to serve, and have not served, as a representative on behalf of a class in any private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, such as lost wages relating to the representation of the Class.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this *1* day of *Sept* 2016

By: *Mary Nancy Esposito*
    Mary Esposito