# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY ESPOSITO, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JOSEPH A. CARLUCCI, JONATHAN L. WILCOX, SYED T. KAMAL, JONATHAN J. McDONOUGH, CENTERBRIDGE CAPITAL PARTNERS L.P., MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., WELLS FARGO SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, and LEERINK PARTNERS LLC,<br><br>       Defendants. | Civil Action No. 16 Civ. 11797 (ADB)<br><br>**CLASS ACTION**<br><br>ECF Case<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Court-appointed Lead Plaintiff Errol Rudman and Rudman Partners L.P. (collectively "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, makes the following allegations based upon the investigation of Lead Plaintiff's counsel, which included, *inter alia*, a review of: the United States Securities and Exchange Commission ("SEC") filings of American Renal Associates Holdings, Inc. ("ARA" or the "Company"); Defendants' public statements; analyst reports and advisories about the Company; media accounts and Government documents concerning ARA; documents filed in *UnitedHealthcare of Florida, Inc. v. American Renal Associates Holdings, Inc.*, No. 16 Civ. 81180 (S.D. Fla.); and interviews of former ARA employees. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of:  (i) a class consisting of all persons other than Defendants who purchased or otherwise acquired ARA common stock between April 20, 2016 and August 18, 2016, inclusive (the "Class Period"), pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (ii) a subclass of all those who purchased ARA common stock in the Company's Initial Public Offering ("IPO") on or about April 21, 2016 (the "April 2016 IPO"), pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Pursuant to the April 22, 2016 Form 424B4 (the "Prospectus") accompanying the April 2016 IPO, ARA sold 8,625,000 shares at a price of $22.00 per share ($20.51 per share net of underwriting discounts), raising approximately $176.9 million in net proceeds for the Company.

2.      ARA is a provider of outpatient dialysis services that owns and operates approximately 200 dialysis clinics throughout the country. According to its website, "ARA operates exclusively through a physician partnership model, in which it partners with approximately 370 local nephrologists to develop, own and operate dialysis clinics."

3.      Dialysis is used by patients with End-Stage Renal Disease (ESRD). "ESRD is a kidney impairment that is irreversible and permanent.  Dialysis is a process for cleaning the blood and removing excess fluid artificially with special equipment when the kidneys have failed. People with ESRD require either a regular course of dialysis or kidney transplantation in order to live."  Interim Final Rule, *Medicare Program; Conditions for Coverage for End-Stage Renal Disease Facilities-Third Party Payment*, 81 Fed. Reg. 90211, 90212 (Dec. 14, 2016) (hereinafter "IFR").

4.      Medicare and Medicaid are social health care programs pursuant to which the government subsidizes an eligible patient's medical treatment. Eligible patients for these programs are often elderly, of limited financial means, or both. Providers of dialysis services such as ARA provide treatment to patients enrolled in Medicare or state Medicaid programs as well as patients enrolled in private health insurance plans.

5.      "According to data published by the United States Renal Data System (USRDS), Medicare is the predominant payer of ESRD services in the United States, covering (as primary or secondary payer) about 88 percent of the United States ESRD patients receiving hemodialysis in 2014.  Among those enrolled in Medicare on the basis of ESRD and receiving hemodialysis in 2015, [the Centers for Medicare and Medicaid Services] has determined 41 percent were enrolled in both Medicare and Medicaid . . . ."  IFR at 90213.

6.      However, private insurance plans reimburse dialysis providers at significantly higher rates than Medicare or Medicaid. For example, a procedure with a Medicare or Medicaid reimbursement rate of approximately $200 will receive an out of network reimbursement rate of approximately $4,000 from a private insurer.

7.      Thus, in order for ARA to operate at a profit, ARA heavily depends on revenues derived from private insurance payors.   Indeed, during the Class Period, ARA publicly acknowledged that one of the main risks to "[a]n investment in shares of [its] common stock" was the potential for a "decline in the number of patients with commercial insurance," Prospectus at 9, and that it needs to "continuously obtain new patients covered by commercial insurance" to avoid adverse operating results, *id.* at 21.

8.      Faced with this financial reality, and an impending initial public offering of its stock scheduled for April 2016 IPO, ARA developed a scheme whereby it could quickly increase revenues and profits.

9.      Specifically, prior to and during the Class Period, ARA systematically in engaged in a high-pressure "insurance education" program, the real purpose of which was to steer patients onto more costly commercial/private insurance plans offered on the exchanges established under the Patient Protection and Affordable Care Act ("ACA").   In other words, patients who were already eligible to receive dialysis through Medicare or Medicaid were pushed into private insurance for the sole purpose of increasing ARA's reimbursement rates.   According to several former ARA employees, Ms. Jennifer Cordeiro – ARA's Vice President of Managed Care and Accounting and the wife of ARA's former Executive Vice President and Chief Operating Officer John J. McDonough – spearheaded this scheme on behalf of ARA's management.

10.    One impediment to ARA's plan was the fact that commercial insurance included premium, copay, coinsurance, and deductible obligations that were not imposed on patients insured by Medicare of Medicaid.  Thus, ARA knew that for the scheme to work it needed to overcome the financial limitations of the vulnerable patient population ARA wanted to steer into commercial plans and thereby assume greater financial obligations.

11.    ARA's solution was an illicit practice pursuant to which ARA (and several of the nation's other largest dialysis providers) funded a non-profit § 501(c)(3) organization, the American Kidney Fund ("AKF"), which, in turn, paid premium assistance to dialysis patients referred to AKF by ARA.  In other word, ARA (and other major dialysis providers) used AKF as a slush fund pursuant to which ARA's contributions were used pay for its patients' increased financial obligations resulting from ARA steering those patients onto commercial insurance plans.

12.    Notably, this arrangement, which bears all the hallmarks of an illicit kickback scheme, was permissible only insofar as AKF treated all assistance applications equally, and did not favor those applications submitted on behalf of patients of ARA and other donating dialysis providers.  Specifically, AKF has publicly defended its premium assistance practices – known as the "HIPP" program – based on an opinion it sought and received from the Department of Health and Human Services, Office of the Inspector General (the "1997 Advisory Opinion").

13.    In that opinion, the OIG made clear that it had relied on AKF's representation that, while AKF would rely on donations from dialysis providers to fund premium assistance grants, those grants would be **equally available to all needy patients regardless of the provider from whom they sought dialysis services**. In other words, a patient who received dialysis from a provider who did not donate a penny to AKF would have the same opportunity to receive

financial assistance as one who received dialysis at a provider like ARA that donated millions of dollars to AKF.

14.   But the description of its program that AKF maintained on its website until recently, demonstrated that AKF had not followed through on its promise to the OIG. To the contrary, in describing its program, AKF specifically instructed dialysis providers that they needed to comply with AKF's "Honor System" by tracking the amount of money their patients received from AKF and donating an equivalent amount back to the program. AKF further instructed those providers who did not want to donate according to that system **to not submit any applications on behalf of needy patients**.  As such, ARA was well aware that AKF's HIPP program was not being administered in accordance with the 1997 Advisory Opinion.

15.   In its Prospectus, ARA represented that it (1) maintained "[r]obust compliance" and "[a]dherence to stringent billing, reimbursement and compliance procedures" and (2) that it "follow[s] a disciplined approach to enhancing performance" in "payor interaction and arrangements; and billing and collection."  Prospectus at 4, 104.  The Prospectus also issued a boilerplate "risk factor" that "it is possible that some of our business activities could be subject to [anti-kickback] laws."  *Id.* at 31.  These statements were materially false and misleading because, unbeknownst to investors, ARA was actively steering vulnerable patients from Medicare and Medicaid into the private market by use of an industry-funded charity, for the sole purpose of collecting larger reimbursements. Far from being a faint possibility, ARA's business and billing practices created a material risk that ARA would be found to have violated anti-kickback laws, or that the enhanced revenue generated from Defendants' steering practices would otherwise cease or materially diminish due to the controversial nature of these practices. Yet, nowhere in ARA's disclosures did it inform investors that certain of its revenue were

derived from insurance plans in which an industry-funded not-for-profit entity was improperly paying for patients' premiums. In fact, the not-for-profit entity at the heart of ARA's revenue-generating scheme—AKF—was never identified in the Prospectus.

16.     Defendants continued their misrepresentations when, during a May 13, 2016 earnings call, an ARA officer attributed increased revenue to patients "opting for an ACA product," which conveyed the misleading impression that patients chose these plans of their own volition, rather than as a result of ARA's and AKF's improper prodding and enticement.

17.     Based on Defendants' false statements, ARA stock price soared, reaching $29.65 per share on June 13, 2016, more than $7.00 higher than ARA's IPO price of $22 a share.

18.     Shortly thereafter, ARA's improper business practices and arrangements caught the attention of insurers and the United States Government.  Specifically, on July 1, 2016 three affiliates of the insurer UnitedHealth Group Inc. ("UnitedHealth") commenced an action against ARA.  *See UnitedHealthcare of Florida, Inc., et al. v. American Renal Associates Holdings, Inc.*, No. 16 Civ. 81180 (S.D. Fla.) (the "*UnitedHealthcare* Action").  In its complaint, UnitedHealth alleged that, beginning in the first quarter of 2016, ARA had engaged in a "fraudulent and illegal scheme," in violation of various state anti-kickback and insurance fraud statutes, in which ARA convinced Medicare and Medicaid-eligible patients to enroll in UnitedHealth plans by referring them to AKF, which would pay for their insurance premiums. ARA engaged in this scheme, the complaint alleged, because United Health's out-of-network reimbursement rate dwarfed the rates for Medicaid and Medicare.

19.     On July 5, 2016 (the first day of trading since the news broke), and prior to the opening of the U.S. securities market, Defendants issued a Form 8-K acknowledging that it had

received the UnitedHealth complaint. By the close of the market on July 5, 2016, ARA shares had declined $2.82 per share or nearly 9.88%, from $28.53 to $25.71 per share.

20.     Consistent with the revelations from the *UnitedHealthcare* Action, on July 27, 2016, an executive for another health insurer, Anthem, Inc., reported on an earnings call of "higher than-expected payments for dialysis treatments during the first half of the year" and that Anthem was "in the process of reviewing the drivers of this increase." By the close of the market on July 27, 2016, ARA shares had declined by $2.18 per share, or approximately 8.20%, from $26.59 to $24.41 per share.

21.     Nonetheless, during an August 10, 2016 earnings call, ARA's Chief Executive Officer, Defendant Joseph A. Carlucci, attempted to downplay the significance of the UnitedHealth lawsuit, claiming that the challenged practice affected only 27 UnitedHealth patients.  As ARA later admitted after the Class Period, however, **the practices at issue** – which extended to insurers other than UnitedHealth – involved several hundred of ARA's patients.

22.     Despite ARA's assurances, on August 18, 2016, the Department of Health and Human Services, Center for Medicare & Medicaid Services ("CMS"), launched an investigation and issued a Request for Information ("RFI") regarding "Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid benefits to Individual Market Plans."   In its RFI, CMS stressed its "serious concerns" about providers steering people eligible for or receiving Medicare and/or Medicaid benefits into individual market plans.

23.     Among other admonitions, the CMS advised that "**it is unlawful** to enroll an individual in individual market coverage if they are known to be entitled to benefits under Medicare Part A, enrolled in Medicare Part B, or receiving Medicaid benefits," RFI at 7 (emphasis added), and that "offering premium and cost-sharing assistance in order to steer

people eligible for or receiving Medicare and/or Medicaid benefits to individual market plans for a provider's financial gain is an inappropriate action that may have negative impacts on patients," *id.* at 9.  As such, the CMS stated that it "is *strongly encouraging* any provider or provider affiliated organization that may be currently engaged in such a practice to end the practice."  (Emphasis added).  On this news, ARA shares declined $2.31 per share or nearly 10.44%, from $ 22.12 to $19.81 per share, on August 19, 2016.

24.  Moreover, several post class-period disclosures and developments further evidence:  (i) ARA's inappropriate business activities; (ii) the falsity or misleading nature of ARA's statements and omissions concerning those practices; and (iii) how the cessation of those activities negatively and materially impacted ARA's profitability.

25.  For example, during ARA's November 11, 2016, third quarter earnings conference call, ARA stated that "in light of the recent CMS public commentary and the potential for policy changes," ARA was "temporarily suspend[ing] application assistance to the [AKF] for charitable premium assistance for patients enrolled in minimum essential Medicaid coverage."  ARA estimated that the "annual financial impact of this temporary change to adjusted EBITDA less non-controlling interests would be up to approximately $17 million," with a potential loss of an additional "$7 million" in adjusted EBITDA depending on the nature of the CMS's guidance.

26.  To put ARA's potential loss of $24 million in adjusted EBITIDA in 2016 in perspective, ARA's entire 2016 third quarter adjusted EBITDA was $32.5 million.  As a result, on November 21, 2016, Goldman Sachs stated that it was downgrading and taking "a more tempered view" on ARA, citing ARA's suspension of its activities with AKF as "a key risk."

27.    Most recently, the CMS issued an IFR addressing patient steering and third-parties' payment of patients' premiums under commercial insurance.  Among other changes, the IFR forbids such third-party payments unless the insurance provider agrees to accept such payments.

28.    In other words, ARA's whole scheme is now dependent on the prior approval of the commercial insurance providers they sought to fleece:  if the insurance providers do not agree to accept premium assistance payments from a third-party where a patient is otherwise eligible for Medicaid or Medicare, then ARA will not be able to use AKF to offset the additional cost to ARA's patients from selecting a commercial plan under the ACA, thereby negating any incentive for an individual to be steered to a commercial plan versus public coverage.

29.    In sum, during the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about ARA's business practices and financial condition.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

30.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

31.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

32.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). The Underwriter Defendants (as defined herein) maintain offices in this District.  The acts and conduct complained of herein occurred in substantial part in this District.

33.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

34.     Lead Plaintiff purchased ARA shares during the Class Period, on dates and at prices that were detailed in a sworn certification that was previously filed with the Court, at artificially inflated prices and has been damaged thereby, including shares purchased on April 21, 2016, traceable to the IPO.

35.     Defendant American Renal Associates Holdings, Inc. is a Delaware corporation with principal executive offices located at 500 Cummings Center, Suite 6550, Beverly, Massachusetts 01915. ARA's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ARA."

36.     Defendant Joseph A. Carlucci ("Carlucci") is the Chief Executive Officer ("CEO") and Chairman of the Board of ARA.

37.     Defendant Jonathan L. Wilcox ("Wilcox") is the Chief Financial Officer ("CFO") and a vice president of ARA.

38.     Defendant Syed T. Kamal ("Kamal") is the President and a director of ARA.

39.    Defendant John J. McDonough ("McDonough") was an Executive Vice President, Chief Operating Officer and Treasurer of ARA.   Mr. McDonough is married to Ms. Jennifer Cordeiro, ARA's Vice President of Managed Care and Contracting during the Class Period and a key player in ARA's revenue enhancement scheme.

40.    Defendants Carlucci, Wilcox, Kamal, and McDonough are sometimes referred to herein as the "Individual Defendants."

41.    Defendant Centerbridge Capital Partners L.P. ("Centerbridge") is a private investment firm with offices in New York and London.   Both before and during the Class Period, Centerbridge was ARA's majority shareholder.   ARA has conceded that, as a result of Centerbridge's majority ownership, ARA was a "controlled company."  Form S-1/A at 51.  As of the IPO, Centerbridge had appointed the majority of ARA's directors, and maintained the right to appoint a majority of ARA's directors during the Class Period.

42.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S") (a subsidiary of Bank of America Corp.), a Delaware corporation, served as an underwriter for the April 2016 IPO. MLPF&S has headquarters in New York, NY, and maintains several offices in this District.

43.    Defendant Barclays Capital Inc. ("Barclays"), a Connecticut corporation, served as an underwriter for the April 2016 IPO. Barclays has headquarters in New York, NY, and maintains an office in this District, located at 125 High Street, 16th Floor, Boston, MA 02110.

44.    Goldman, Sachs & Co. ("Goldman Sachs"), a Delaware corporation, served as an underwriter for the April 2016 IPO. Goldman Sachs has headquarters in New York, NY, and maintains an office in this District, located at 125 High Street, 20th Floor, Boston, MA 02110.

45.     Wells Fargo Securities, LLC ("Wells Fargo"), a Delaware corporation, served as an underwriter for the April 2016 IPO. Wells Fargo has headquarters in San Francisco, CA, and maintains several offices in this District.

46.     SunTrust Robinson Humphrey ("SunTrust"), a Tennessee corporation, served as an underwriter for the April 2016 IPO. SunTrust has headquarters in Atlanta, GA, and maintains an office in this District, located at 125 Summer Street, #1700, Boston, MA 02110.

47.     Leerink Partners LLC ("Leerink"), a Delaware corporation, served as an underwriter for the April 2016 IPO. Leerink has headquarters in and maintains an office in this District, located at 1 Federal Street, 37th Floor, Boston, MA 02110.

48.     Defendants MLPF&S, Barclays, Goldman Sachs, Wells Fargo, SunTrust, and Leerink are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants collectively received estimated discounts and commissions of approximately $11.14 million in connection herewith.

## RELEVANT NON-PARTIES

49.     AKF is registered as a tax-exempt, nonprofit organization under Section 501(c)(3) of the Internal Revenue Code.  *See* 26 U.S.C § 501(c)(3). AKF is based in Rockville, Maryland.

50.     According to its website, AKF's mission is to "help people fight disease and live healthier lives," which it claims to accomplish "by providing financial support to patients in need, and by delivering programs that educate, build awareness, and drive advocacy, resulting in greater public understanding and ultimately the prevention of kidney disease." (*See* http://fund.org/about-us/vision-and-mission/).

51.     Upon information and belief, through its Health Insurance Premium Payment ("HIPP") program, AKF now collects hundreds of millions of dollars in "donations" from dialysis providers every year. It then uses those funds to pay insurance premiums for dialysis patients who are receiving services from AKF's provider "donors."  In 2015, AKF reported approximately $275.6 million in "gross receipts" to the Internal Revenue Service, a substantial increase over its 2014 gross receipts (more than $253.7 million) and its 2013 gross receipts ($233.6 million).

52.     AKF's HIPP program is primarily funded by donations from third-party dialysis providers, including ARA.

53.     CW1 worked at ARA from July 2013 until September 2016 in a variety of positions, including:  Accounts Receivable Specialist from January 2015 to May 2015; Senior Admissions Coordinator from May 2015 to January 2016; and Admission Team Lead from January 2016 to September 2016.  As Admissions Team Lead, CW1's immediate superior was a Director/Manager of Admissions who, in turn, reported to Ms. Jennifer Cordeiro.

54.     CW2 worked at ARA as a Patient Account Specialist from March 2014 to the end of October 2014.   In that capacity, CW2 worked as an Admissions Coordinator and in Collections.  CW2 was assigned to approximately seven clinics in Texas.  As an Admissions Coordinator, CW2 was responsible for receiving new patient information from CW2's assigned clinics and going through the so-called "admissions checklist."

55.     CW2 reported to Mr. Jess Archambault, who, in turn, reported to Ms. Jennifer Cordeiro.  At that time, Ms. Cordeiro was the manager of CW2's department.  CW2 resigned from ARA because CW2 did not agree with ARA's practice of patient steering, which CW2 divulged to ARA's Compliance Officer during CW2's exit interview.

## CLASS ACTION ALLEGATIONS

56.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and: (i) all persons other than Defendants who were purchasers of ARA common stock between April 20, 2016 and August 18, 2016, inclusive (the "Class"), and (ii) a subclass of all persons other than Defendants who purchased the common stock of ARA in the April 2016 IPO on or about April 21, 2016 (the "Subclass").

57.    Excluded from the Class and Subclass are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

58.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable. Throughout the Class Period, ARA shares were actively traded on the NYSE, with more than 8.8 million shares outstanding.  The precise number of Class and Subclass members is unknown to Lead Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class and Subclass members can be ascertained from the books and records of ARA, its transfer agent or the underwriters of the April 2016 IPO. Notice can be provided to such record owners by a combination of published notice and first class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

59.    Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Subclass.  Lead Plaintiff has retained competent counsel experienced

in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

60.   Lead Plaintiff's claims are typical of the claims of the other members of the Class and Subclass because Lead Plaintiffs' and Class and Subclass members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.   Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class or Subclass.

61.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since the damages suffered by individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Subclass members to seek redress for the wrongful conduct alleged. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

62.   Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by ARA and/or the Individual Defendants, to the investing public during the Class Period were materially false and misleading;

(c)   whether Defendants acted with scienter in making false or misleading statements during the Class Period;

16

(d)     whether the price of ARA common stock was artificially inflated during the Class Period; and

(e)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

Among questions of law and fact common to the Subclass are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein; and

(b)     whether the Registration Statement (including the Prospectus) issued by ARA to the investing public in connection with the April 2016 IPO negligently omitted and/or misrepresented material facts about the Company and its business.

## SUBSTANTIVE ALLEGATIONS

## I.

## ALLEGATIONS PERTINENT TO THE EXCHANGE ACT CLAIMS

**A.     Defendants' Business Operations and Structure**

63.     ARA is "a national provider of kidney dialysis services for patients suffering from chronic kidney failure, also known as end stage renal disease, or ESRD."  Q2 Form 10-Q at 8 (Aug. 9, 2016).  "As of June 30, 2016," ARA "owned and operated 201 dialysis clinics treating 13,755 patients in 25 states and the District of Columbia."  *Id.*   According to ARA, the Company:  (i) is "the largest dialysis services provider in the United States focused exclusively on joint venture partnerships with physicians," (ii) "derive[s] [its] patient service operating revenues from providing outpatient and inpatient dialysis treatments," and (iii) that the sources of payment for these services principally are "government-based programs…as well as commercial insurance plans."

64.     ARA's executives view the company's operations and manage its business as one, consolidated, operational whole, adopting and implementing enterprise-wide strategies from what they refer to as their Beverly, Massachusetts "corporate headquarters."  According to ARA: (i) "the chief operating decision maker, or decision-making group, [makes] decisions [about] how to allocate resources and assess performance. The Company's chief decision-maker is a combination of the Chief Executive Officer, the Chief Operating Officer and the President," and (ii) "[t]he Company views its operations and manages its business as one reportable business segment, the ownership and operation of dialysis clinics, all of which are located in the United States." Q2 Form 10-Q at 9 (Aug. 9, 2016).

65.     In describing its business structure, ARA explained "[w]e, through American Renal Associates LLC or another subsidiary… typically enter into a joint venture operating agreement… and a management services agreement… pursuant to which we provide various support services to our clients," and that "we provide our JV clients with **all of the managerial, accounting, financial, technological and administrative support necessary to operate our clinics**." Prospectus at 108, 111.[1]  In detailing the specific managerial services/assistance ARA provides to its clinics, it explained:

> [t]he management services we provide to our clinics generally include:… human resource functions, general accounting functions; clinical and technical services;… providing manuals, policies and procedures; performing payroll processing…; **billing and collection and payment of accounts receivable**; providing staff training programs;…preparing annual operating budgets;…procuring and maintaining insurance policies; and performing legal and compliance services.

*Id.* at 111.

---

[1] Other otherwise stated, all emphasis has been added.

66.   With respect to its joint venture clinics, ARA stated that its "majority voting interest and/or contractual rights . . . . provide[] the Company with the ability to direct the activities of "various joint ventures entities that" most significantly influence the entity's economic performance" and that "the Company as determined that it is the primary beneficiary of these entities."  Q2 Form 10-Q at 13 (Aug. 9, 2016).

67.   ARA directs the activities of its joint venture clinics through, *inter alia*, a company-wide "Code of Ethics," which it displays on its website.  That Code states:  "Please note when we use 'ARA' in this Code, we mean American Renal Associates Holdings, Inc., its subsidiaries, joint ventures and controlled affiliated entities, including the dialysis facilities."

68.   In the Code, ARA sets forth its company-wide policies including the routine waiver of copays and deductibles, the providing or promising of things of value to induce patronage and referrals, and the "special obligation" ARA entities have to bill accurately and "comply with payor requirements."

69.   ARA also finances and funds the operations of its subsidiaries, all the way down to the clinic level. For example, in its April 20, 2016 Form S-1/A, ARA stated that it would use the proceeds it generated from its initial public offering of stock "to fund our continued growth through the development of new clinics, expansion of existing clinics or acquisition of clinics that we may identify from time to time."  Form S-1/A at 14.

70.   ARA's revenues, earned through the operation of dialysis clinics are called "patient service operating revenues" and are realized by and credited to ARA on its financial statements. In its Q2 Form 10-Q, for example, ARA explained that "[t]he major component of our revenues, which we refer to as patient service operating revenues, is derived from dialysis services."  Q2 Form 10-Q at 31 (Aug. 9, 2016).

71.    ARA also makes "charitable contributions," which it identifies as part of its "Operating Expenses."  Form S-1/A at 80.  According to ARA, general and administrative expenses per treatment increased from $40 as of December 31, 2014 to $43 as of December 31, 2015, which it attributed to, *inter alia*, an "increase in charitable contributions."  *Id.* at 83.

B.    **Insurance Coverage for Dialysis Treatment**

72.    The majority of dialysis services are paid for by government programs. "Medicare pays for routine maintenance dialysis provided by Medicare-certified ESRD facilities, also known as dialysis facilities."  IFR at 90212.  "In addition to Medicare, Medicaid provides coverage for some people with ESRD.  Many individuals enrolled in Medicare may also qualify for full benefits under the Medicaid program on the basis of their income, receipt of Supplemental Social Security Income, being determined medically-needy, or other eligibility categories under the State Plan."  *Id.*  "According to data published by the United States Renal Data System (USRDS), Medicare is the predominant payer of ESRD services in the United States, covering (as primary or secondary payer) about 88 percent of the United States ESRD patients receiving hemodialysis in 2014.  Among those enrolled in Medicare on the basis of ESRD and receiving hemodialysis in 2015, CMS has determined 41 percent were enrolled in both Medicare and Medicaid . . . ."  *Id.* at 90213.

73.    Patients with ESRD may also seek coverage from private commercial insurance plans.  These plans often differ in terms of the services they cover, the facilities and providers they consider to be in-network, the premiums they charge, and the costs they require patients to bear in the form of premiums, coinsurance, copays, and deductibles.

74.    The ACA created exchanges run by states and the federal government that are market forums where insurance companies offer various health insurance plans for individuals to

compare and purchase for themselves or their families. The plans offered in the exchange are

called Qualified Health Plans and must meet certain requirements in terms of the benefits they

offer, as required by the ACA.

75.    Dialysis providers receive significantly higher payments for the same services

from commercial insurance providers versus Medicare or Medicaid.   Indeed, after reviewing

numerous comments from market participants, the CMS observed:

> **All commenters who addressed the issue made clear that enrolling a patient
> in commercial coverage (including coverage in the individual market) rather
> than public coverage like Medicare and/or Medicaid is of significant financial
> benefit to dialysis facilities**.   For example, one comment cited reports from
> financial analysts estimating that commercial coverage generally pays dialysis
> facilities **an average of four times more per treatment** . . . .   A number of other
> commenters explained that commercial coverage reimburses dialysis facilities at
> significantly higher rates overall.

IFR at 90214.

76.    And, as reported in an October 23, 2016 *St. Louis Post Dispatch* article entitled,

"DaVita encouraged some low-income patients to enroll in commercial plans," "Private insurers

can pay as much as $4,000 per treatment, while government plans such as Medicaid or Medicare

pay $300 . . . ."

77.    The availability of commercial insurance is dependent on whether a patient

receives or is eligible for benefits under a government program.   As the CMS has observed:

> [I]ndividuals who are already covered by Medicare generally cannot become
> concurrently enrolled in coverage in the individual market.   Section 1882(d)(3) of
> the [Social Security] Act makes it unlawful to sell or issue a health insurance
> policy (including policies issues on and off Exchanges) to an individual entitled to
> benefits under Medicare Part A or enrolled under Medicare Part B with the
> knowledge that the policy duplicates the health benefits to which the individual is
> entitled.   Therefore, while an individual with ESRD is not required to apply for
> and enroll in Medicare, once they become covered by Medicare it is unlawful for
> them to be sold a commercial health insurance policy in the individual market if
> the seller knows the individual market policy would duplicate benefits to which
> the individual is entitled.

IFR at 90213.

78.     Unlike patients with coverage under the government programs – who typically have no payment obligations as a result of some combination of Medicare, Medicare supplemental insurance, and state Medicaid programs – patients on commercial plans are responsible for various costs such as plan premiums.

79.     However, as CMS explained, because the premiums owed under commercial insurance plans are considerably less than the reimbursement rate, dialysis providers have a strong incentive to pay the their patients' premiums in order to take advantage of greater commercial insurance reimbursement rates *vis-á-vis* government programs.   In other words dialysis providers can greatly benefit:

> by making a relatively small outlay to pay an individual's premium to enroll in commercial coverage so as to receive a much larger payment for providing an identical set of health care services.  **This asymmetry creates strong financial incentive for such providers to use premium payments to steer as many patients as possible.**

IFR at 90214.

80.     And in fact, "[u]ntil the late 1990s, the dialysis companies routinely paid these expenses.  But a federal law outlawed that practice, out of concern that covering a patient's bills might dissuade that patient from switching to another clinic that might provide better care." Katie Thomas and Reed Abelson, *Kidney Fund Seen Insisting on Donations, Contrary to Government Deal*, New York Times (Dec. 25, 2016) (the "December 2016 *New York Times* Article").

## C.     The AKF and its Third-Party Premium Assistance Program

81.     Despite the law forbidding direct payments from dialysis providers to cover the cost of their patients' expenses under private insurance, the AKF entered into a limited

agreement with the Government that permitted it to make such payments on behalf of dialysis clinic patients.

82.     As reported in the December 2016 *New York Times* Article:  "The Kidney Fund's payments are part of an unusual deal it made with the government and the dialysis industry 20 years ago.  The arrangement allows the dialysis companies to avoid violating anti-kickback laws. It allows dialysis clinics to donate to the Kidney Fund, treat patients whose insurance premiums are paid by the charity and then collect money from insurers for those patients' treatments – essentially guaranteeing a steady stream of paying customers."

83.     That deal stems from the 1997 Advisory Opinion ARA received from the HHS Office of the Inspector General, as to whether it could use donations to pay for Medicare Part B or "Medigap" premiums for financially needy Medicare beneficiaries with ESRD without being subject to civil monetary penalties under section 231(h) of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA").

84.     Section 231(h) of HIPPA gives the OIG the authority to impose civil monetary penalties against entities who offer remuneration to a program beneficiary that they know or should know will influence the beneficiary's decision to order or receive items or services covered by Medicare or Medicaid from a particular provider, practitioner, or supplier.

85.     As a result of this agreement, major dialysis providers, such as ARA, flooded AKF with donations.  Thus, in 1995, AKF only had "a $5 million annual budget and contributions from the dialysis industry that accounted for less than 10 percent of its donations." December 2016 *New York Times* Article.  By 2015, however, "the Kidney Fund reported revenue of $264 million, making it one of the country's 100 largest nonprofits."  *Id.*

86.     Nonetheless, payment of patient insurance premiums by third-parties has been a consistent concern of the HHS, which has counseled insurers to reject such payments because of the overall impact they have on the cost of healthcare.

87.     For example, the HHS Secretary recently explained in a November 4, 2013 FAQ that:  "**HHS has significant concerns with this practice** because it could skew the insurance risk pool and create an unlevel field in the Marketplaces. **HHS discourages this practice** and encourages issuers to reject such third party payments."

88.     And in a May 30, 2014, Supplemental Special Advisory Bulletin, the HHS OIG noted that (i) donor contributions to charities with patient assistance programs as well (ii) grants made by such charities could violate anti-kickback provisions, and emphasized the following example as one raising especial concerns:

> [W]e also expressed our concern that, in some cases, charities might define their disease funds so narrowly that **the earmarking effectively results in donor's subsidization of its own products** . . . .
>
> **A charity with narrowly defined disease funds may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors or** if other facts and circumstances suggest that the disease fund is operated to induce the purchase of donors' products.

89.     Consistent with these concerns, the 1997 Advisory Opinion, set forth specific guidelines that AKF and certain donating providers would need to follow for AKF's premium payment program to avoid being subject to civil monetary penalties.

90.     Among other limitations/conditions, the OIG stated that AKF could not track the amount of contributions made by each dialysis provider and then apportion funds to each provider's patients in proportion to the amount of the dialysis provider's contributions. Specifically, OIG stated that AKF could not "earmark" "contributions…for the use of particular beneficiaries or groups of beneficiaries," "take into account the identity of the referring provider

or the amount of any donation top AKF by such provider," or "assure" providers "that the amount of HIPP assistance their patients receive bears any relationship to the amount of their donations."  1997 Advisory Opinion at 6.

91.    The OIG also stated that providers likewise could "not track the amounts that AKF pays on behalf of patients dialyzing at their facilities in order to calculate amounts of future contributions[.]" *Id.*

92.    Finally, the OIG emphasized that HIPP assistance should be "available to any financial needy ESRD patient regardless of provider" and should not be "limited to patients of the [donating] companies." *Id.*

93.    Before the commencement of the *UnitedHealthcare* Action in July 2016, AKF publicly stated that it operated its HIPP program "strictly in accordance" with the 1997 Advisory Opinion.

94.    But AKF's detailed public description of its program showed that the program directly contravened the 1997 Advisory Opinion by instructing and requiring donors to calculate the amounts of their future contributions based on the draw they expected their patients to take, and limiting access to premium assistance to patients of providers who donated their "fair share."

95.    AKF's description of its HIPP Guidelines in May 2014 (*i.e.*, the official policies and procedures for the premium assistance program) ("Guidelines") contained a section describing what AKF called its "HIPP Honor System."   In that section, AKF instructed that "each referring dialysis provider should make equitable contributions to the HIPP pool." Guidelines at 5.  AKF also wrote that each provider should "reasonably determine its 'fair share' contribution to the pool [*i.e.* the funds available for premium assistance] by considering the number of patients it refers to HIPP." *Id.*   And AKF emphasized that all providers had an

"ethical obligation to contribute their respective 'fair share' to ensure that the HIPP pool is adequately funded." *Id.*  Finally, AKF told providers that "[i]f your company cannot make fair and equitable contributions, **we respectfully request your organization not refer patient to the HIPP program** . . . ." *Id.*

96.    Since the filing of the *UnitedHealthcare* Action, AKF has altered its description of its eligibility requirements in order to obfuscate its violation of the 1997 Advisory Opinion, stating nebulously that:  "HIPP is restricted to patients who have limited means (based on income to debt ratio) of paying primary and/or secondary health insurance premiums and who would lose coverage in the absence of assistance form HIPP."  HIPP Guidelines at 7 (Aug. 2016).

97.    However, various investigative news reports have since confirmed that AKF did not abide by the 1997 Advisory Opinion's conditions before and during the Class Period.  For example, a *New York Times* exposé found that "the charity has resisted giving aid to patients at clinics that do not donate money to the fund."  December 2016 *New York Times* Article.  That investigation discovered that, "[i]n multiple cases, the charity pushed back on workers at clinics that had not donated money, discouraging them from signing up their patients for assistance.  **Until recently, the Kidney Fund's guidelines even said clinics should not apply for patient aid if the company had not donated to the charity**." *Id.*

98.    The *New York Times* further found that "**[f]or years** . . . the Kidney Fund's preference for patients at the biggest clinics has been an open secret among many social workers, who said that as result they had stopped applying for assistance entirely." *Id.*

99.    CW2 has confirmed the *New York Times'* account, stating that CW2 saw correspondence between AKF and ARA, wherein AKF stated that ARA should not apply for patient payment assistance in excess of the amount donated by ARA to AKF.

100.   The AKF's failure to abide by the 1997 Advisory Opinion subjects it to serious consequences.  As the *New York Times* further reported, "if the rules are not followed, the Office of the Inspector General has the right to end the agreement, **which would profoundly change the relationship of the industry and the charity**." *Id.*  In other words, "'[i]f all the conditions are not met, the opinion is without force and effect,' said Donald White, a spokesman for the agency." *Id.*

**D.     Defendants' Scheme:  Steering Patients to More Profitable Commercial Insurance and Using its AKF Donations as a Slush Fund to Pay Their Patients' Premiums**

101.   As noted above, ARA is reimbursed for its services through a combination of payments received from its patients' insurance plans and from the patients themselves in the form of the deductible, copay, and coinsurance obligations required by each patient's respective insurance plan.  Although the services that ARA provides to a patient do not vary depending on the patients' insurance plan, the reimbursement or "benefit" payment that ARA receives from the patients' insurer for those services varies greatly depending on the patient's coverage.

102.   For example, according to the complaint filed in the *UnitedHealthcare* Action, if patients are covered by Medicaid, ARA would receive the State Medicaid reimbursement rate. But if patients are covered by a private, out-of-network commercial plan, ARA can receive the out-of-network reimbursement rate for the same services, which can amount to several thousand dollars and can exceed the Medicaid reimbursement rate by a factor of twenty or more.

103.   Tempted by these economics, ARA implemented a scheme prior to and during the Class Period designed to maximize the number of its patients covered by commercial insurance plans offered on the ACA exchanges, and thereby capture greater reimbursement payments *vis-á-vis* government insurance.  Specifically, ARA endeavored to cause ESRD patients to drop or

move away from primary government insurance and convert to commercial insurance plans under the ACA.

104.   CW2 explained that he was one of the first employees to get a patient enrolled on an ACA commercial plan instead of Medicare, and that CW2 was instructed to do this by Ms. Jennifer Cordeiro.   According to CW1 and CW2, Ms. Jennifer Cordeiro "spearheaded" management's efforts to steer ARA's patients to ACA commercial plans.   CW2 added that Ms. Cordeiro berated CW2 for at times when CW2 signed patients up for Medicaid rather than private ACA insurance.

105.   CW2 explained that ARA's initial practice for patients without insurance or with expiring insurance was to call Medicare, determine how many Medicare credits the individual had, and sign the patient up for Medicare if possible.   CW2 further explained that once ARA determined that the reimbursements from marketplace insurance plans were much greater than Medicare reimbursements, ARA began steering patients to ACA exchanges.

106.   According to CW2, part of the process for getting ARA's patients coverage on the ACA, was getting them denied for Medicare.   CW2 relayed that there is a so-called "entitlement form," known as "ESRD 2728," that is filled out by the nephrologist and has a "Medicare box," which indicates whether the patient was eligible for Medicare benefits.   CW2 further explained that he observed ARA dialysis clinics intentionally decline to check this box.

107.   ARA also aggressively pushed commercial insurance plans under the guise of an "insurance education" program for its patients.

108.   As Admissions Team Lead, CW1 was involved with ARA clinics in several states, including Ohio, and personally took part in pitching insurance coverage to ARA's patients.

According CW1, CW1's immediate supervisor made clear that the goal of patient education was to "sell" private insurance.

109. CW1 explained that many of ARA's patients were on Medicaid, and that CW1 and CW1's coworkers frequently discussed with these patients the kinds of commercial insurance plans that could be obtained on the ACA exchanges. According to CW1, states differed as to whether they "coordinate," meaning whether they permitted individuals to have both Medicaid and a marketplace plan.

110. CW1 further explained that because getting patients with Medicaid coverage to also obtain marketplace coverage was far more profitable for ARA, management tasked ARA's legal department with determining all the states that permitted coordination. Once armed with that information, ARA engaged in a "big push" in late 2015 and early 2016 to get patients onto commercial plans during the open enrollment period.

111. CW1 stated that ARA's management emphasized increasing the amount of patients with commercial coverage, "would not take no for an answer" if ARA personnel disagreed with that kind of patient interaction, and placed "a lot of pressure" on personnel and patients. Such pressure included trying to get patients to enroll in a commercial plan on the *same day* they were first receiving the purported "insurance education" from ARA personnel.

112. CW1 believed that ARA's push to sign certain of its patients up for commercial insurance plans was improper because those plans were unnecessary since many of their patients already had coverage under government programs. CW1 confirmed that these practices created friction between the clinics and management, who CW1 believed were placing revenues ahead of the needs of patients. CW1 claims to have voiced displeasure with ARA's practices, but those

complaints were not well-received by ARA's management, which is why CW1 ultimately resigned.

113.   Similarly, CW2 resigned because CW2 did not agree with ARA's practice of patient steering, a concern which CW2 raised with ARA's Compliance Officer during CW2's exit interview.

114.   One impediment to ARA's scheme was that its ESRD patients received dialysis treatments at little or no charge under government insurance, but would be responsible for substantial additional costs/premiums under commercial insurance plans.   Because ARA's patients were often elderly and indigent, any additional out-of-pocket costs would render the commercial plans economically unfeasible.   ARA's solution was to make donations to the AKF, which, in turn, were then granted to ARA's patients to cover their commercial insurance premiums.

115.   As explained by CW2, ARA had few contracts with insurance providers, and therefore their ARA services were "out-of-network with everyone." This resulted in potential out-of-pocket deductibles for ARA's patients who ARA steered to private insurance.   CW2 explained that ARA avoided this problem by getting their patients assistance from AKF, and that CW2 was not aware of a single instance where AKF denied assistance to an ARA patient.

116.   ARA controlled every step in the relationship with AKF. ARA introduced the HIPP program to patients in ARA clinics; provided them with the requisite application for assistance; assisted the patients in filling out that application; and submitted the applications on their behalves.   CW2 explained that ARA had access to AKF's computer system in order to check the status of patients' applications, *i.e.*, whether they were "approved" or "pending."

117.   Critically, ARA then ensured that the patients would receive HIPP assistance by making "charitable contributions" to AKF, earmarked for the patients' premiums in accordance with the AKF policy in place at the time.   Many patients would bring bills they received for premium obligations into the ARA clinic and ARA would ensure that the premiums were paid for by AKF. Other patients were instructed that AKF would send premium assistance checks directly to them so that they could make the premium payments in order to avoid detection by insurance plans that did not accept third-party premium payments.

118.   ARA's involvement with AKF, however, was in knowing violation of the 1997 Advisory Opinion that exempted AKF from anti kick-back laws.   Among other violations, ARA was only permitted to obtain premium assistance for its patients up to the amount it contributed to AKF, as explained on AKF's website.   In this connection, CW2 saw correspondence between AKF and ARA, wherein AKF stated that ARA should not apply for patient payment assistance in excess of the amount donated by ARA to AKF.

119.   The Honor System *quid-pro-quo* was not the only way ARA and AKF contravened the representations AKF had made to, and guidelines it had obtained from, the OIG. Before this lawsuit was initiated, according to AKF's own description of its program, patients whose dialysis services were covered by Medicaid, Medicare or another public-assistance program were not eligible for HIPP assistance to pay for alternate commercial coverage. AKF explicitly stated that its HIPP program was "a 'last resort' source of assistance" to dialysis patients and its funds were "restricted to patients who have limited means of paying health insurance premiums…and who would forego coverage" without the benefit of HIPP.   Guidelines at 6.   AKF emphasized that "[a]lternative programs that pay for primary or secondary health coverage… such as Medicaid… **must** be utilized first."   *Id.* (emphasis in original).

120.   And yet, ARA repeatedly and systematically submitted HIPP applications to AKF on behalf of patients that did not meet the program's eligibility requirements because they had or were eligible for Medicaid or Medicare. AKF then ignored its own program requirements in determining whether to distribute funds to ARA patients, and provided unnecessary grants to dozens of patients who were fully insured at the time their applications were submitted by ARA.

121.   CW2 explained that, prior to the *UnitedHealthcare* Action, one of the ACA's insurance plans onto which ARA steered its patients – and for which it patients received AKF assistance – was Blue Cross HMO.  According to CW2, once Blue Cross HMO learned that it was losing money reimbursing ARA for dialysis treatments that were reimbursable at a fraction of the price from public insurance, it started demanding refunds from ARA.

E.      **Defendants' Materially False and Misleading Statements**

1.      **The IPO Prospectus**

122.   On or about April 20, 2016, ARA filed with the SEC an amended Form S-1/A Registration Statement (the "Registration Statement") that incorporated a prospectus to be used in connection with the offer and sale of ARA shares.

123.   The Registration Statement was signed by the Individual Defendants (with the exception of Defendant McDonough) pursuant to a power of attorney on April 20, 2016.

124.   On or about April 22, 2016, ARA filed the final version of the IPO prospectus, which formed part of the Registration Statement that became effective on April 20, 2016 (the "Prospectus"). The Prospectus solicited investors for an IPO of 8,625,000 shares of ARA common stock (including the over-allotment option) at a price of $22.00 per share, for proceeds to the Company of approximately $176,900,000.

125.   With respect to ARA's business practices, the Prospectus stated, *inter alia*, that ARA: (i) had a "robust compliance" program and adhered to "stringent billing, reimbursement, and compliance procedures"; (ii) provided "[e]xperienced managerial and operational support" for "key functions such as clinical and technical services, billing, collections, payor contracting, regulatory and compliance"; (iii) provided "[p]roactive education to patients  . . . on insurance coverage to help alleviate cost and scope of coverage concerns."   Prospectus at 100. Additionally, ARA stated that "[o]ur nephrologists appreciate the quality of our dialysis clinics, best practices management services and solid track record of clinical and regulatory compliance," *id.* at 2, and that ARA "endeavor[s] to structure" it business "to comply with applicable laws and regulations," including federal and state "anti-kickback and self-referral laws," *id.* at 33.

126.   The Prospectus also described ARA's growth strategy as follows:

**Our Growth Strategy**

We believe our focus on the JV model, our core values and the strength of our experienced management team have driven the growth in our patient population and physician relationships, and position us to execute on the following growth strategies.

…

***Deliver on Our Core Values with Best Practices Management Services***

We intend to continue to focus on providing high-quality patient care, clinical autonomy to physicians and extensive professional, operational and managerial support to our clinics through management services arrangements. Based on our experience in the dialysis services industry, **we will continue to follow a disciplined approach to enhancing performance in key areas such as: revenue cycle management; patient registration; facilitation and verification of insurance; payor interaction and arrangements; and billing and collection.** We believe this has positively impacted our revenue per treatment and allowed us to maintain low levels of days' sales outstanding and bad debt expense. In addition, we believe our management services reduce the burden of back-office management responsibilities associated with the daily operations of a dialysis clinic and enable our physician partners to focus on providing high-

quality patient care. As a result, we consistently deliver high-quality clinical outcomes.

*Id.* at 8

127. The statements in ¶¶ 125 and 126 above, were materially false and/or misleading because they misrepresented and failed to disclose the adverse facts, which were known to Defendants or recklessly disregarded by them. Defendants' assertion that ARA maintained a "disciplined approach to enhancing performance," and that they maintained a "robust compliance" program were directly contrary to the facts that ARA: (i) was improperly and aggressively steering patients eligible for government insurance coverage to private commercial insurance plans in order to increase revenues per treatment; (ii) was improperly funding AKF knowing that those funds would be earmarked to make premium assistance payments to patients that ARA could not make directly, despite the fact the HHS had already expressed grave reservations concerning this practice; (iii) knew that AKF limited its HIPP program to its donor clinics' patients, and in an amount proportional to the clinics' donations, in violation of the 1997 Advisory Agreement; (iv) assisted Medicare and Medicaid eligible patients' applications to AKF, contrary to AKF's published guidelines; and (v) knew that its practices were being scrutinized by commercial insurance providers, such as Blue Cross.

128. At a minimum, Defendants knew, but failed to disclose, that their undisclosed practice of patient steering in conjunction with AKF's HIPP program, which appeared to violate the 1997 Advisory Opinion, raised a significant risk of increased scrutiny or challenge from insurance providers/government regulators, and thereby rendered tenuous a significant segment of ARA's business, which was attributable to reimbursements received from commercial insurance coverage.

129.   Defendants also identified the following investment risks:

An investment in shares of our common stock involves substantial risk and uncertainties that may adversely affect our business, financial condition and result of operations and cash flows.  Some of the more significant challenges and risks relating to an investment in us involve, among other things, the following:

• **decline in the number of patients with commercial insurance or decline in commercial payor reimbursement rates;**

  …

• **changes to the Medicare ESRD program that could affect reimbursement rates and evaluation criteria, as well as changes in Medicaid or other non-Medicare government programs or payment rates;**

• **federal or state health care laws that could adversely affect us;**

• **our ability to comply with all of the complex federal, state and local government regulations that apply to our business, including those in connection with federal and state anti-kickback laws and state laws prohibiting the corporate practice of medicine or fee-splitting, and risks arising from heightened federal and state investigations and enforcement efforts.**

*Id.* at 9-10.

130.   Defendants also identified the following "Risks Related to Our Business":

***We depend on commercial payors for reimbursement at rates that allow us to operate at a profit.***

**Commercial payors pay us at rates that are generally significantly higher than Medicare rates and the rates paid by other government-based payors such as state Medicaid programs. For the three years ended December 31, 2015, we derived on average approximately 40% of our patient service operating revenues from commercial payors, including for non-contracted providers, even though commercial payors were the source of reimbursement for on average approximately 13% of the treatments performed during the three years ended December 31, 2015.** Medicare rates are generally insufficient to cover our total operating expenses allocable to providing dialysis treatments for Medicare patients. **As a result, our ability to generate operating earnings is substantially dependent on revenues derived from commercial payors, some of which pay negotiated payment rates and others of which pay based on our usual and customary fee schedule.** To the extent the proportion of commercial payors decreases relative to government

payors as a source of reimbursement for treatments, it would have a material adverse effect on our revenues, operating results and cash flows.

***If the number of patients with commercial insurance declines, our operating results and cash flows would be adversely affected***

**Our revenues are sensitive to the number of patients with commercial insurance coverage.** A patient's insurance coverage may change for a number of reasons, including as a result of changes in the patient's or a family member's employment status. Factors that may cause an increase in the number of patients who have government-based programs as their primary payors include: recent economic conditions, the expansion of certain state Medicaid programs under healthcare reform laws, improved longevity and lower standard mortality rates for ESRD patients, resulting in a lower percentage of patients covered under employer group health plans or other commercial insurance plans. To the extent there are sustained or increased job losses in the United States, we could experience a decrease in the number of patients under employer group health plans. **We could also experience a further decrease if changes to the healthcare regulatory system, including as a result of healthcare reform laws, result in fewer patients covered under employer group health plans or other commercial insurance plans**. In addition, our continued negotiations with commercial payors could result in a decrease in the number of patients under commercial insurance plans to the extent that we cannot reach agreement with commercial payors on rates and other terms. **If there is a significant reduction in the number of patients insured through commercial insurance plans relative to patients insured through government-based programs, it would have a material adverse effect on our revenues, earnings and cash flows**.

\* \* \*

***If we do not continuously obtain new patients by commercial insurance, our operating results and financial condition would be adversely affected.***

. . . . **If there is a significant reduction in the number of new dialysis patients covered by commercial insurance, we would not receive the benefit of the 30-month coordination period of higher reimbursement rates from commercial payors, which would materially adversely affect our operating results and cash flows**.

\* \* \*

***Federal or state healthcare reform laws could adversely affect our operating results and financial condition.***

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act,

commonly and jointly referred to as the Affordable Care Act (the ACA). The ACA, among other things, increased the number of individuals with private insurance coverage and Medicaid, implemented reimbursement policies that tie payment to quality, facilitated the creation of accountable care organizations that may use capitation and other alternative payment methodologies, strengthened enforcement of fraud and abuse laws and encouraged the use of information technology. Some of these changes require implementing regulations which have not yet been drafted or have been released only as proposed rules.

While the ACA was intended to increase the number of insured persons by expanding eligibility for public programs or assistance and compelling individuals and employers to purchase health coverage, the ACA may increase pricing pressure on existing commercial payors by seeking to reform the underwriting and marketing practices of health plans. **As a result, some commercial payors have sought and may continue to seek to lower their rates of reimbursement for the services we provide . . . .**

We expect that additional federal and state healthcare reform measures will be adopted in the future and cannot predict how employers, private payors or persons buying insurance might react to these changes. **Full implementation of the ACA or any future healthcare reform legislation may increase our costs, limit the amounts that federal and state governments and other third-party payors will pay for healthcare products and services, expose us to expanded liability or require us to revise the ways in which we conduct our business, any of which could materially adversely affect our business, results of operations and financial condition.**

\* \* \*

*If we fail to adhere to all of the complex federal, state and local government regulations that apply to our business, we could suffer severe consequences that could adversely affect our operating results and financial condition.*

Our dialysis operations are subject to extensive federal, state and local government regulations, all of which are subject to change. These government regulations currently relate, among other things, to:

- government healthcare program participation requirements;

- **requirements related to reimbursement for patient services, including Medicare and Medicaid reimbursement rules and regulations**, rules addressing the priority of payors, signature and documentation requirements, and coding requirements;

- **federal and state anti-kickback laws, the federal physician self-referral prohibition statute (the "Stark Law") and analogous state physician self-referral statutes;**

- **false claims prohibitions for healthcare reimbursement programs and other fraud and abuse laws and regulations**, including the federal False Claims Act, a provision in the ACA extending the federal False Claims Act to include, under certain circumstances, claims based on violations of the federal anti-kickback law, and other civil monetary penalty laws, **including laws prohibiting offering or giving remuneration to any beneficiary of a federal healthcare program that such person knows or should know is likely to influence the beneficiary to order or receive any item or service reimbursable under such program**.

*Id.* at 20, 21, 29-31.

131.    The statements ¶¶ 129 and 130, were materially false and/or misleading because they misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them.  Defendants' statements regarding the importance of obtaining patients with commercial insurance coverage and the impact of their failure to comply with applicable regulations were misleading because Defendants failed to disclose that ARA:  (i) was improperly and aggressively steering patients eligible for government insurance coverage to private commercial insurance plans in order to take advantage of higher reimbursement rates; (ii) was improperly funding AKF knowing that those funds would be earmarked to make premium assistance payments to patients that ARA could not make directly, despite the fact the HHS had already expressed grave reservations concerning this practice; (iii) knew that AKF limited its HIPP program to its donor clinics' patients, and in an amount proportional to the clinics' donations, in violation of the 1997 Advisory Agreement; (iv) assisted Medicare and Medicaid eligible patients' applications to AKF, contrary to AKF's published guidelines; and (v) knew that its practices were being scrutinized by commercial insurance providers, such as Blue Cross.  This

unethical and reckless practice left the Company vulnerable to both civil and potentially criminal liability pursuant to, among other things, anti-kickback and insurance fraud statutes.

132.    Similarly, Defendants incomplete representation that "it is possible that some of our business activities could be subject to [anti-kickback] laws" misled investors because it failed to disclose that ARA's core business model, and a significant portion of the Company's revenues, were, in fact, dependent on unethical and/or illegal business practices.  Defendants knew that the AKF's HIPP program – based on AKF's public description of how the program operated – violated the 1997 Advisory Opinion, thereby rendering its protections from anti-kickback provisions void.

133.    Defendants also omitted material facts from investors when they failed to disclose that a large portion of ARA's revenue was derived from insurance plans in which an industry-funded not-for-profit entity was improperly paying patients' premiums. In fact, AKF, the not-for-profit at issue, was not mentioned once in the Prospectus.

134.    At a minimum, Defendants knew, but failed to disclose, that their practice of patient steering in conjunction with AKF's HIPP program, which appeared to violate the 1997 Advisory Opinion, raised a significant risk of increased scrutiny or challenge from insurance providers/government regulators, and thereby rendered tenuous a significant segment of ARA's business, which was attributable to reimbursements received from commercial insurance coverage.

**2.    May 12, 2016 Press Release, May 13, 2016 Earnings Call, and May 16, 2016 Q1 Form 10-Q**

135.    On May 12, 2016, prior to the opening of U.S. securities markets, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2016. For the quarter, the Company reported that net patient service operating revenues increased 15%

to $172.1 million, and that adjusted EBITDA less non-controlling interests ("Adjusted EBITDA-NCI") increased 9% to $27.2 million. Net income attributable to ARA increased 31% to $3.8 million, and total dialysis treatments increased 15%.

136.    During the question and answer portion of ARA's earnings call held the next day, Defendant John McDonough, ARA's Chief Operating Officer, attributed the increase in revenue to the increase of patients signing up for Affordable Care Act ("ACA") plans, in response to an analysts inquiries:

ANA GUPTE, LEERINK PARTNERS – ANALYST

Okay. The second question was about -- you saw improvement in both revenue per treatment -- your mix shift, it looks like [it's just] commercial a little bit. And then cost of treatment also has come in a little better. But do you think on a normalized basis, there is still more operating profit per treatment improvement that is possible . . .?

DEFENDANT McDONOUGH

And I'll start with the first part on the revenue side.  And what I can comment on the revenue side, year-over-year we saw about $1.50 increase on a per treatment on revenue per treatment. And as Jon noted, **that was mainly driven by commercial mix. In the underlying of that is, we've seen some more patients covered under ACA plans as we go into the first quarter. And that's good for patients because these are patients that would not have been – would not maybe have insurance coverage or has better insurance coverage under an ACA plan than the alternative. So that's been good for patients, and that's really been the driver of our increase in our revenue per treatment year-over-year.**

* * *

DAVID MacDONALD, SUN TRUST ROBINSON HUMPHRY – ANALYST

Okay. And then, guys, one other quick question just on payer mix. If you look year-over-year, did payer mix continue to tick up modestly? And is that largely being driven by some exchange business? Just any color on payer mix that you had.

DEFENDANT McDONOUGH

As Jon mentioned off in his prepared remarks is that we have seen a slight improvement in payer mix.  And as I just said, the underlying – **what we see is patients opting for an ACA product.**  And those are patients that previously maybe wouldn't be covered under an insurance or a plan, or the ACA has offered them better coverage than their alternative.

137.    The statements in the preceding paragraph concerning ARA's "commercial mix" of business, which includes patients covered by insurance plans offered on the ACA exchanges, were materially false and/or misleading because they misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them.  Defendants' statements were misleading because Defendants failed to disclose that ARA:  (i) was improperly and aggressively steering patients eligible for government insurance coverage to private commercial insurance plans in order to inflate revenues per treatment; (ii) was improperly funding AKF knowing that those funds would be earmarked to make premium assistance payments to patients (that ARA could not make directly), despite the fact the HHS had already expressed grave reservations concerning this practice; (iii) knew that AKF limited its HIPP program to its donor's patients, and in an amount proportional to their donations, in violation of the 1997 Advisory Agreement; (iv) assisted Medicare and Medicaid eligible patients' applications to AKF, contrary to AKF's published guidelines; and (v) knew that its practices were being scrutinized by commercial insurance providers, such as Blue Cross.  This unethical and reckless practice left the Company vulnerable to both civil and potentially criminal liability pursuant to, among other things, anti-kickback and insurance fraud statutes.

138.    Defendants' statement that patients had "opted" for ACA plans was also false or misleading because it intimated that ARA's patients chose such coverage of their own volition.

41

This was false, as many patients had opted for this choice only after ARA had advised them of this option, and successfully induced them to sign up by utilizing AKF to pay their premiums.

139.    At a minimum, Defendants knew, but failed to disclose, that their practice of patient steering in conjunction with AKF's HIPP program, which appeared to violate the 1997 Advisory Opinion, raised a significant risk of increased scrutiny or challenge from insurance providers/government regulators, and thereby rendered tenuous a significant segment of ARA's business, which was attributable to reimbursements received from commercial insurance coverage.

140.    On May 16, 2016, the Company filed a quarterly report for the period ended March 31, 2016 on a Form 10-Q with the SEC (the "Q1 Form 10-Q"), signed by, Defendant Wilcox, which reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Carlucci and Wilcox, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

141.    The Q1 Form 10-Q incorporated by reference "the risk factors previously disclosed in the 'Risk Factors' section of the Prospectus."  Those risk factors, which are quoted above at ¶¶ 129 to 130, were false and misleading for the same reasons set forth above in paragraphs ¶¶ 131 to 134.

   3.    The *UnitedHealthcare* Action, ARA's July 15, 2016 Form 8-K, and the Anthem Announcement:  The Truth Begins to Emerge

142.    On July 1, 2016, UnitedHealth commenced an action in the United States District Court of the Southern District of Florida against ARA alleging that ARA fraudulently billed UnitedHealth for millions of dollars since the beginning of the year. Specifically, the complaint

alleges that ARA engaged in a fraudulent and illegal scheme to convert ESRD patients in Florida and Ohio from affordable government insurance to United's commercial plans, in order to reap much higher payments.

143.    Specifically, the *UnitedHealthcare* Action charges that:

- [S]ince the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans. (Complaint at ¶ 5, *UnitedHealthcare*, No. 16 Civ. 81189 (S.D. Fla. July 1, 2016), ECF No. 1).

- The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.  (*Id.* at ¶ 4).

- Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).  (*Id.* at ¶ 5).

- Knowing of its out-of-network status with United plans, and believing that it can ill United more than $4,000 *for the same services* being rendered to Medicaid and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.  (*Id.* at ¶ 7).

- To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.  (*Id.* at ¶ 8).

- The solution ARA implemented was deceptive, fraudulent, and illegal. (*Id.* at ¶ 9).

- *First*, ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose. (*Id.* at ¶ 10).

- *Second*, ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—i.e., plans that would result in the highest out-of-network reimbursement to ARA. (*Id.* at ¶ 11).

- *Third*, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA. (*Id.* at ¶ 12).

144.    According to the *UnitedHealthcare* Complaint, "ARA's actions violated several important criminal and civil laws, including Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. § 817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's Anti- Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 et seq.) ("FDUTPA")." *Id.* at ¶ 14.

145.    UnitedHealth further alleged that it had "already paid millions of dollars in benefits to ARA" for claims ARA submitted as part of its illegal and unethical conversion and billing scheme. *Id.* at ¶ 16.

146.    While UnitedHealth sued only for payments made on behalf of Ohio and Florida patients, it made clear that "ARA's scheme does not appear to be limited to Ohio and Florida," noting that the California Department of Managed Health Care recently sought further information from UnitedHealth regarding out-of-network requests submitted for outpatient dialysis performed by an ARA subsidiary. *Id.* ¶¶ 109-13.

147.    CW2 has confirmed that ARA's practice was not limited to Florida and Ohio, or limited to any particular commercial insurers.

148.    The *New York Times* and the *Wall Street Journal* reported on the *UnitedHealthcare* Action after the close of market on Friday, July 1, 2016. The *New York Times* article focused on AKF and its questionable relationship with dialysis providers.

149.    Specifically, the *New York Times* noted that AKF has close ties to the dialysis industry:

> [D]ialysis companies pay for [AKF's] premium-assistance program, and in 2015, 78 percent of its $264 million in revenue came from two companies, according to its financial disclosures. The kidney fund declined to name the companies. The organization's chairwoman is a former executive at DaVita and Fresenius Medical Care, the nation's two leading dialysis chains.
>
> **Those industry ties expose the profit motive that underpins the programs, according to Patrick Burns, executive director of Taxpayers Against Fraud, a whistle-blower advocacy group**.
>
> 'There is a bottom line here, and the people who manage these programs are well aware of it, on both sides,' he said.

Reed Abelson and Katie Thomas, *UnitedHealthcare Sues Dialysis Chain Over Billing*, New York Times (July 1, 2016).

150.    The article further noted that "[k]idney transplants, rather than dialysis, are seen as the best options for most patients with end-stage renal disease, but the American Kidney Fund does not pay for premiums after patients receive a kidney transplant. Patients were not informed of that." *Id.* In other words, AKF would not pay for premiums once a patient became less profitable to its donors in the dialysis industry.

151.    On July 5, 2016 (the first day of trading since the news broke), and prior to the opening of the U.S. securities market, Defendants issued a Form 8-K, which stated as follows:

> On July 1, 2016, American Renal Associates Holdings, Inc. (the "Company") received a complaint filed by three affiliates of UnitedHealth Group Inc. ("United") in the United States District Court of the Southern District of Florida. **The complaint relates to 27 patients who have received dialysis at 12 ARA facilities in Florida and Ohio and who elected to receive coverage under one**

45

**of United's Affordable Care Act ("ACA") insurance products, effective on or after January 1, 2016. At this time, approximately 33 patients across 15 clinics in 5 states with United ACA products receive dialysis care at the Company's facilities**. The complaint identifies approximately $1.9 million of payments made to 12 of the Company's facilities that United claims were improper. The complaint seeks monetary damages and injunctive relief. The Company believes this lawsuit is without merit. **The Company intends to vigorously defend itself in this legal matter; however, no assurance can be given as to the timing or outcome of this matter, or can any assurance be given as to whether the filing of this lawsuit will affect the Company's other relationships, or the Company's business generally**. The Company's top priority continues to be providing the highest quality care to patients that choose to receive dialysis services at the Company's facilities.

152.    Defendants' disclosures regarding the *UnitedHealthcare* Action were misleadingly incomplete.  Defendants' statements gave the impression that the wrongful conduct described in the *UnitedHealthcare* Complaint was limited in scope, impacting only 27 patients.  As Defendants later admitted however, the fraudulent scheme described in the *UnitedHealthcare* Complaint was systemic, and impacted over 500 patients covered by various commercial employers. *See* ¶¶ 186-88.

153.    By the close of the market on July 5, 2016, ARA shares declined $2.82 per share or nearly 9.88%, from $28.53 to $25.71 per share.

154.    Additionally, the practices exposed by the *UnitedHealthcare* Action prompted increased scrutiny by other commercial insurance providers who saw unexpected increases in their payments for dialysis treatments.  For example, later that month, John Gallina, the CFO of the health insurer Anthem, Inc. reported during a July 27, 2016 earnings call that:

> ***We have experienced higher-than-expected payments for dialysis treatments during the first half of the year, which we are in the process of reviewing the drivers of this increase.*** All in, our updated outlook now expects the individual ACA-compliant business  to incur  mid single-digit operating  margin losses for the 2016 benefit year.

155.     By the close of the market on July 27, 2016, ARA shares had declined by $2.18 per share, or approximately 8.20%, from $26.59 to $24.41 per share. An analyst at Barclays Capital Inc. noted that Anthem's comments "further exacerbated" ARA's underperformance, initially caused by revelations in the *UnitedHealthcare* Action.

**5.       August 9, 2016 Q2 Form 10-Q and August 10, 2016 Earnings Call:  More of the Truth Is Partially Revealed**

156.     On August 9, 2016, ARA filed is Q2 Form 10-Q with the SEC, which was signed by Defendant Wilcox.  In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Carlucci and Wilcox, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

157.     The August 9, 2016 Q2 Form 10-Q incorporated by reference "the risk factors previously disclosed in the 'Risk Factors' section of the Prospectus."  *Id.* at 42.  Those risk factors, which are quoted above at ¶¶ 129 to 130, were false and misleading for the same reasons set forth above in ¶¶ 131 to 134.

158.     The Company also disclosed that it was under investigation by the SEC in connection with the improper practices at issue in the *UnitedHealthcare* Action:

> On July 26, 2016, the Staff of the Securities and Exchange Commission (the "SEC") sent a letter to the Company stating that it is conducting an inquiry and requesting that ARAH provide certain documents and information relating to the subject matter covered by the United complaint described above. The Company intends to respond to this request and to fully cooperate with SEC Staff. No assurance can be given as to the timing or outcome of these matters, nor can any assurance be given as to whether the filing of this lawsuit and any inquiries will affect the Company's other relationships, or the Company's business generally.

*Id.*

159.    On August 10, 2016, ARA held its Q2 Earnings Call.  During the call, Defendant Wilcox reported that increases in ARA's revenue per treatment were attributable in large part to increases in the number of their patients on commercial insurance plans:

> **Our revenue per treatment in the second quarter was $375, or 2.8% above the second quarter of 2015**. We have seen increases in our revenue-per-treatment trends**, driven primarily by improvements in commercial mix, including growth in ACA plans and other commercial insurance products**.
>
> As far as our commercial mix goes, we have provided additional disclosure in our 10-Q to provide you with our trailing 12 months commercial mix. At June 30, 2016, our LTM commercial mix was approximately 16%. This compares to the historical disclosure we provided of 13%, which was our three-year rolling average as of December 31, 2015.
>
> **The incremental 3% is attributable primarily to patients who have chosen ACA plans and other commercial insurance products**.

160.    Defendant McDonough made similar statements during the earnings call, while at the same time trying to downplay the significance of ARA's reimbursements under ACA plans versus other commercial plans:

> As John Wilcox shared with you, **we've seen an uptick in our commercial mix, including an increase in patients who have chosen ACA plans as their primary insurance.** The mix improvement has led to increases in our revenue per treatment, but it is important to emphasize that our average ACA revenue per treatment is below our average commercial revenue per treatment. Our commercial book of business is also spread out, so we do not have large exposures to any one payer or product.

161.    Defendants Wilcox and McDonough's statements were false and/or misleading because they misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them.   Defendants' statements regarding their commercial mix of business was misleadingly incomplete because Defendants failed to disclose that ARA: (i) was improperly and aggressively steering patients eligible for government insurance coverage to private commercial insurance plans in order to increase reimbursements;

(ii) was improperly funding AKF, knowing that those funds would be earmarked to make premium assistance payments to ARA's patients, despite the fact the HHS had already expressed grave reservations concerning this practice; (iii) knew that AKF limited its HIPP program to its donor clinics' patients, and in an amount proportional to the clinics' donations, in violation of the 1997 Advisory Agreement; (iv) assisted Medicare and Medicaid eligible patients' applications to AKF, contrary to AKF's published guidelines.

162.    Also during that call, Defendant Carlucci attempted to downplay the significance of the *UnitedHealthcare* Action, by stating that ARA had been made aware of the claims and had previously reserved for the claims (albeit without advising investors of the claims):

> Point number one, the number of patients and the revenue recorded in connection with United ACA products **are immaterial to the Company's financial statements. As we disclosed previously in an 8-K on July 5th, after the complaint was filed, there are only approximately 33 patients who chose United ACA plans across all of ARA's clinics, and the complaint relates to 27 of these patients.**

> ARA has previously established contractual allowances for United's ACA products. In addition, of the $1.9 million in payments listed in the lawsuit, **prior to the lawsuit, based in part on contract discussions with United, ARA had reserved a significant amount as a payer-refund liability on its balance sheet, and therefore, we believe the exposure to be immaterial** . . . .

> Point number three, ARA advocates for patients by helping to educate them about their insurance options, **so patients can then choose the best option that is available to them and their families** . . . .

163.    Defendants' disclosures regarding the *UnitedHealthcare* Action were misleadingly incomplete.  Defendants' statements gave the false impression that the wrongful conduct described in the *UnitedHealthcare* Complaint was limited in scope, impacting only 27 patients.  As Defendants later admitted however, *see* ¶¶ 186-88, the fraudulent scheme described in the *UnitedHealthcare* Complaint was systemic, and impacted over 500 patients covered by various commercial employers.

164.    Additionally, Defendants' statement that the impact of the misconduct alleged in the *UnitedHealthcare* Action was "immaterial" was false and misleading and/or created the false impression ARA's ultimate exposure was only $1.9 million.  As Defendants later admitted, its cessation of business activities with AKF – the exact improper relationship at the heart of the *UnitedHealthcare* Action – was projected to cost the between $17 and $24 in adjusted EBITDA for 2016 alone.

165.    Defendants' disclosures regarding the *UnitedHealthcare* Action were also false or misleadingly incomplete because they gave the impression that ARA's patients had freely opted to obtain ACA commercial insurance coverage, when ARA had in fact engaged in a high pressure, company-wide push to steer patients on commercial insurance in order to improperly increase ARA's reimbursements.

166.    Defendant Carlucci also acknowledged that ARA had funded AKF, the entity used to pay ARA's patients' private insurance premiums:

> ARA is proud of the work that the American Kidney Fund does for dialysis patients. ***We, along with others in our industry, make charitable contributions to the American Kidney Fund, and we think nonprofit organizations like the American Kidney Fund do amazing work by helping needy dialysis patients.*** We think their activities are firmly on the right side of public policy.

> At ARA, we believe chronically ill, very sick patients with many comorbidities should always be treated with dignity and respect, and should always have access to quality healthcare. Patients who choose the ACA plans to cover their care should not be looked down upon if a charitable organization determines necessary funding is appropriate.

> At ARA, we will continue to fight for these patients and ensure that they receive excellent care at our clinics or others, so they are allowed to travel outside the state they live in, so they are allowed to be placed on transparent waiting lists, and so there [sic] are allowed to continue their entitlements through Medicaid if they wish to retain that as a secondary insurance.

> It is a core value at ARA to advocate for each and every patient that chooses us for their care, and we will see to it that the care they receive is unmatched in terms

of quality, convenience, and provided with dignity; that's what we stand for at ARA.

167.    Defendant Carlucci's statements were false and/or misleading because they misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them.  Defendant Carlucci's statements regarding ARA's relationship with AKF failed to disclose that ARA: (i) was improperly and aggressively steering patients eligible for government insurance coverage to private commercial insurance plans in order to increase reimbursements; (ii) was improperly funding AKF, knowing that those funds would be earmarked to make premium assistance payments to ARA's patients, despite the fact the HHS had already expressed grave reservations concerning this practice; (iii) knew that AKF limited its HIPP program to its donor clinics' patients, and in an amount proportional to the clinics' donations, in violation of the 1997 Advisory Agreement; and (iv) knew that AKF approved grant applications from Medicare and Medicaid eligible patients, contrary to AKF's published guidelines.

168.    During the Q&A portion of the earnings call, Defendant John McDonough further discussed ARA's patients who had both ACA commercial plans and Medicaid coverage:

JOSHUA RASKIN, BARCLAYS CAPITAL – ANALYST

Okay, and then just last one. The individuals that are signing up for these ACA plans, are they previously uninsured? Or what's the mix of how many were previously uninsured versus how many are coming via Medicaid with Medicaid becoming a secondary payer?

DEFENDANT McDONOUGH

Yes, this is John McDonough again. **So it's a mix of patients that will choose an ACA, and some of those patients didn't have insurance benefits, they've chosen the ACA**. Some of the patients had had, as an example, Joe talked about it with United, they had Medicaid. And as you know, Medicaid is the payer last resort. **So when a patient and their family makes the choice for an ACA, that becomes the primary payer and Medicaid becomes a secondary payer**

**because they are the payer of last resort**. So it's a combination of that of both of those categories of patients that have chosen an ACA.

169.     Defendant McDonough also responded as follows to an analyst inquiry concerning whether other commercial insurance providers putting downward pressure on reimbursement rate for dialysis services in light of the *UnitedHealthcare* Action:

<u>JOANNA GAJUK, BOFA MERRILL LYNCH – ANALYST</u>

Right, but on the flip side, we would think that maybe there's some pressure on actual commercial rates. And because of the lawsuit and also the commentary from other health plans about higher dialysis cost on exchange patients. So is there any pressure on the actual commercial rate?

<u>DEFENDANT McDONOUGH</u>

Yes, so what I would say on that is as we disclosed, our average commercial revenue rate on ACA plans is less than our commercial average revenue per treatment. So ACA plans, on average, have a lower revenue per treatment than commercial plans.

**As it relates to another payer that mentioned ACA plans, I would say the number of patients at American Renal that have chose that plan is immaterial. It's actually pretty similar number of patients that shows that plan that shows the United ACA plan, which was 33**.

170.     These statements in ¶¶ 168 and 169 were false and misleading because they gave the impression that ARA's patients had freely opted to obtain ACA commercial insurance coverage, when ARA had in fact engaged in a high pressure, company-wide push to steer patients on commercial insurance in order to increase ARA's reimbursements.  These statements were also false and misleading because they gave the impression that number of ARA patients that purportedly chose ACA insurance with other health plans was immaterial when, as Defendants later admitted, the number was in excess of 500 patients.  *See* ¶¶ 186-88.

171.    Defendant Carlucci also evaded an analyst question aimed at ascertaining why the number of ARA's patients covered by commercial insurance increased at a greater rate than the number of ARA's competitors' patients covered by commercial insurance:

GARY LIEBERMAN, WELLS FARGO SECURITIES – ANALYST

Good morning, thanks for taking my question. **It would appear that your commercial mix has increased faster than some of your competitors. For example, if you looked at DaVita's results, their revenue per treatment was up about $2.60 year over year versus yours of about $10**, and combined with the information that you gave us on the increase in the commercial mix. **Is there a reason that you all would be able to move patients into the exchange plans at a more rapid rate**? Is there something about where your clinics are located or your Medicaid mix?

DEFENDANT CARLUCCI

Hi Gary. This is Joe Carlucci. I think it's really important to recognize, and as you do, as we all do, **the patients can choose the Affordable Care Act for their insurance. So that's an individual patient choice**.

As it relates -- as our growth relates to our competitors, **we really don't have empirical evidence as to what's included in our competitors' commercial mix. So it's really impossible for us to compare our growth to our competitors**. As we indicated at some point, we include the Veterans Administration in our commercial mix, and I think others may not. But to get into that sort of apples-to-apples and speculative comparisons I think would be not appropriate for us.

172.    Defendant Carlucci's statements were false and/or misleading because he misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them; namely, that the rapid increase in the number of ARA patients on commercial insurance was due to ARA's high pressure, company-wide push to steer patients on commercial insurance in order to increase ARA's reimbursements.

173.    Defendant Carlucci also deferred to Darren Lehrich, ARA's Senior Vice President of Strategy and Investor Relations to answer questions regarding AKF's operations:

GARY LIEBERMAN, WELLS FARGO SECURITIES – ANALYST

Okay, and then I just -- how do you -- what do you think the resolution of this could be outside of the lawsuit? Is it on a state-by-state basis? Do the states get to decide if the plans are required to take the premium support to the American Kidney Fund and how might that play out?

DARREN LEHRICH

Thanks. Hey Gary. So first, I think at the federal level, **HHS has provided guidance for third-party premium payments from not-for-profit charitable foundations. And the guidance from HHS has been [sound] with regard to AKF**.

So in the notice of benefit and payment parameters for 2017, what HHS said is they're deferring the question of third-party payments by nonprofit foundations like AKF to future rule-making. So the next possible opportunity at the federal level could be the 2018 rule-making cycle. . . .

174.    Mr. Lehrich's statement regarding the soundness of HHS' guidance regarding third-party premium payments from AKF was false and misleading because he misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them; namely that AKF had been operating its HIPP program in direct violation of the 1997 Advisory Opinion. *See* ¶¶ 81-100.

175.    By the close of the market on August 11, 2016, ARA's shares declined by $0.48 per share or 2.02%, from $23.78 to $23.30 per share.

**6.    The CMS' August 18, 2016 RFI – The End of the Class Period**

176.    On August 18, 2016, following the close of the markets, news outlets reported that the CMS had issued a "Request for Information" ("RFI") concerning "Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans." Specifically, CMS stated:

This request for information seeks public comment regarding concerns about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan

for the purpose of obtaining higher payment rates. CMS is concerned about reports of this practice and is requesting comments on the frequency and impact of this issue from the public. **We believe this practice not only could raise overall health system costs, but could potentially be harmful to patient care and service coordination because of changes to provider networks and drug formularies, result in higher out-of-pocket costs for enrollees, and have a negative impact on the individual market single risk pool (or the combined risk pool in states that have chosen to merge their risk pools).** We are seeking input from stakeholders and the public regarding the frequency and impact of this practice, and options to limit this practice.

\*   \*   \*

We have heard anecdotal reports that individuals who are eligible for Medicare and/or Medicaid benefits are receiving premium and other cost-sharing assistance from a third party so that the individual can enroll in individual market plans for the provider's financial benefit.  In some cases, a health care provider may estimate that the higher payment rate from an individual market plan compared to Medicare or Medicaid is sufficient to allow it to pay a patient's premiums and still financially gain from the higher reimbursement rates. . . .

\*   \*   \*

CMS seeks to clarify that offering premium and cost-sharing assistance in order to steer people eligible for or receiving Medicare and/or Medicaid benefits to individual market plans for a provider's financial gain is an inappropriate action that may have negative impacts on patients.  **CMS is strongly encouraging any provider or provider-affiliated organization that may be currently engaged in such practice to end the practice.**

RFI at 1, 6, 9.

177.    That same day, the CMS issued a press release regarding its RFI, again reiterating its concerns "that some health care providers and provider-affiliated organizations may be steering people eligible for, or receiving, Medicare and/or Medicaid benefits into [ACA]-compliant individual market plans . . . for the purpose of obtaining higher reimbursement rates." The press release noted that CMS "also sent letters to all Medicare-enrolled dialysis facilities," such as ARA, "informing them of this announcement."

55

178.    The *Wall Street Journal* reported on this news in an August 18, 2016 article, issued after the close of the U.S. markets, entitled "U.S. Opens Probe Into Concerns Over Health-Provider Payments," which mentioned the *UnitedHealthcare* Action, and in pertinent part reported:

> WASHINGTON -- The Obama administration has launched a probe into whether healthcare providers such as dialysis centers are steering patients eligible for Medicare and Medicaid benefits into insurance plans offered on the health law's exchanges.
>
> The Centers for Medicare and Medicaid Services on Thursday said it sent warning letters to all dialysis centers that participate in the federal Medicare program. The agency also said it is weighing financial penalties on providers who are found to have directed people eligible for Medicare into Affordable Care Act plans instead.
>
> "We are concerned about reports that some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients' needs," said CMS Acting Administrator Andy Slavitt in a news release.
>
> The agency said it was examining "concerns that some health care providers and provider-affiliated organizations may be steering people" who are eligible for Medicare or Medicaid into ACA plans.
>
> The concern, according to the CMS, is that health-care providers or organizations affiliated with them may be paying insurance premiums for patients who would otherwise qualify for Medicare and Medicaid. This would allow the patients to instead get coverage on the ACA exchanges from insurance companies that offer the providers higher reimbursement rates than are given under the federal health programs.
>
> "There is a direct conflict of interest for providers to pay patients' premiums with the sole intent of increasing their own reimbursement," said Clare Krusing, a spokeswoman at America's Health Insurance Plans, an industry trade group.
>
> **Concerns by some insurers over the potential practice have spurred legal action. In July, UnitedHealth Group Inc. sued kidney-care chain American Renal Associates Holdings Inc., accusing it of fraud. The lawsuit said American Renal Associates engaged in a "fraudulent and illegal scheme" to get larger payments from the insurer by persuading patients to sign up for UnitedHealth plans and connecting them with a charity, American Kidney Fund, that helped pay their premiums.**

179.     The article also reported on possible monetary penalties for offenders:

**CMS said it is also considering actions, including banning or limiting premium payments for ACA plans by health-care providers and changes to Medicare and Medicaid provider enrollment rules.**

**The agency said it is weighing civil monetary penalties** on health-care providers if their actions cause Medicare-eligible patients to suffer penalties for signing up late to the federal program because they were steered into an ACA exchange plan.

The Obama administration said it is concerned that the payment arrangements also may be steering sicker patients onto ACA plans, skewing the population to consumers who are more expensive for insurers. Some insurers have withdrawn or curtailed participation on the exchanges, which is where consumers go to obtain coverage and qualify for subsidies, citing higher-than-expected costs of covering patients who are older or sicker than they expected.

180.     On this news, ARA shares declined by $2.31 per share or nearly 10.44%, from

$22.12 to $19.81 per share on August 19, 2016.

**F.     Post Class Period Revelations and Developments Further Demonstrating the Falsity and Materiality of Defendants' Class Period Misstatements and Omissions**

181.     On October 23, 2016, the *St. Louis Post-Dispatch* published an article entitled "DaVita encouraged some low-income patients to enroll in commercial plans."  That article confirmed that the patient steering practices of which ARA had been accused were common practice among the nation's largest dialysis providers.

182.     That article revealed that complaints by insurance companies faced with skyrocketing costs was the impetus for the CMS' investigation:  "Sudden spikes in payments to dialysis centers raised red flags for major health insurers, and they complained to the federal government. It was a significant financial hit they were not expecting."

183.     According to a spokeswoman for the industry group "America's Health Insurance Plans," the dialysis providers' patient steering was "**causing instability** . . . raising prices for everyone."  This sentiment was echoed by public-policy experts:  "'**If you suddenly shift these**

**folks into private plans, you're moving cost increases to marketplace plans,**' said Jack

Hoadley, a research professor at Georgetown University's Health Policy Institute."

184.    After the close of the market on November 11, 2015, ARA held its Q3 Earnings

Conference Call, at which time Defendant Wilcox stressed that because "we understand the

importance of a stable marketplace," ARA had "temporarily" suspended its relationship with

AKF:  [P]ending potential new policy guidance from CMS, **we are temporarily suspending**

**application assistance to the AKF for ACA plans for patients enrolled in pre-existing**

**minimal essential Medicaid coverage**."

185.    ARA's suspension of its involvement with AKF  prior to any clear indication

from CMS that it would be limiting the use of third-party premium assistance programs, provides

powerful evidence that ARA always knew that the permissibility of AKF's HIPP program was

highly suspect at best and subject to challenge, if not outright illegal.

186.    Defendant Wilcox also revealed that ARA's decision to cease aiding its clients

applications to AKF for payment assistance would materially and negatively impact ARA's

adjusted EBITDA:

> **We estimate that the annual financial impact of this temporary change to**
> **adjusted EBITDA less noncontrolling interests would be up to approximately**
> **$17 million**. If CMS were to issue broader guidance that made access to
> charitable premium assistance unavailable to all ESRD patients on ACA plans,
> **the estimated annual financial impact** to adjusted EBITDA less noncontrolling
> interests **would increase by up to an estimated $7 million**.
>
> . . .
>
> Our adjusted EBITDA less noncontrolling interest, or adjusted EBITDA less NCI
> during the third quarter of 2016 was $32.5 million.

187.    In this connection, Defendant Wilcox for the first time provided a breakdown of

ARA's patients who had commercial insurance under the ACA. Among other revelations was the

fact that ARA had far more patients who were eligible for Medicaid but obtained coverage under

the ACA, than initially disclosed in connection with the *UnitedHealthcare* Action:

At September 30, 2016, approximately 535 patients elected coverage under ACA

plans. . . .

[**A]pproximately 300 patients that have chosen ACA plans also had Medicaid as secondary coverage and virtually all of these patients received assistance from the AKF**. . . .

**Of the remaining approximately 235 patients enrolled in ACA plans, approximately 85% of them received assistance from the AKF HIPP program**.

188.    Defendant Carlucci provided further insight into the basis for the ARA's decision

to purportedly voluntarily suspend ARA's involvement with AKF, as well as the impact on

ARA's business:

So let me start my discussion with the CMS RFI that was issued on August 18. We welcome the CMS request for information. . . .

We aren't sure when CMS will issue regulatory guidance on this topic, but **in light of the recent CMS public commentary and the potential for policy changes from CMS over the next month, we have made the decision to temporarily suspend application assistance to the American Kidney Fund for charitable premium assistance for patients enrolled in minimum essential Medicaid coverage** who are seeking additional coverage through an ACA plan for the 2017 open enrollment season.

As of September 30, 2016, **approximately 300 patients had pre-existing minimum essential Medicaid coverage and also chose additional coverage through an ACA plan**. Virtually all of these Medicaid patients have relied on charitable premium assistance because they are ineligible for federal premium tax credits.

**If CMS establishes new policies to restrict or limit charitable premium assistance for ACA plans to patients with pre-existing Medicaid coverage, these patients will likely revert back to Medicaid-only coverage**. We're implementing these new policies temporarily in light of comments made by CMS and pending the issuance of formal CMS policies.

In addition, approximately 235 patients were enrolled in an ACA plan but not enrolled in a Medicaid program as of September 30, 2016. Approximately 85% of these non-Medicaid patients have relied on charitable premium assistance. Again, we continue to believe these patients are benefiting from ACA coverage. . . .

. . .

**Insurance coverage disruptions could result if CMS establishes new guidelines that extend to this subset of patients, which include both on-exchange and off-exchange ACA plan enrollees.**

189.     Defendant Carlucci also stated, that, as a result of the CMS's investigation into improper patient steering, ARA had made significant changes to its insurance education program:

> **We've made a number of improvements in the area of patient insurance education** ahead of the 2017 open enrollment season. An important development in this area is that **our patient insurance educators are receiving more intense training that should provide our staff with even greater proficiency when it comes to ACA plans and coverage options**.

190.     Finally, Defendant Carlucci advised "that John McDonough will be stepping down from his role at ARA, effective December 31, 2016."

191.     Shortly thereafter, on November 21, 2016, *Bloomberg News* reported in an article entitled "American Renal Cut at Goldman After Charitable Premium Suspended," that Goldman Sachs was taking "a more tempered view" on ARA, and cited ARA's suspension of its activities with AKF as "a key risk."  As a result of the Goldman Sachs downgrade, ARA shares declined $2.09 per share, or nearly 8.67%, from $24.10 to $22.01 per share on November 21, 2016.

192.     On December 14, 2016, the CMS issued the IFR.  The CMS noted that the IFR was based upon its review of over 800 public comments it received from various sources including patients, providers and provider-affiliated organizations involved in the financing of care for patients, health insurance companies and social workers.

193.    In particular, CMS noted that the Government had serious concerns about so-called patient "steering" by dialysis providers, as well dialysis providers use of third-party entities to off-set the cost of commercial insurance to further their "steering" efforts:

> **HHS has recently become concerned about the inappropriate 'steering' of individuals eligible for or entitled to Medicare or Medicaid into individual market plans**.  In particular, HHS is concerned that because individual market health plans typically provide significantly greater reimbursement to health care providers than public coverage like Medicare or Medicaid, providers and suppliers may be engaged in practices designed to encourage individual patients to forego public coverage for which they are eligible and instead enroll in an individual market plan . . . .   **Further, as one tool to influence these coverage decisions health care providers may be offering to pay for, or arrange payment for, the premium for the individual market plan**.

> . . .

> Supporting premium payments to facilitate enrollment of their patients in individual markets coverage is . . . in the financial interest of the dialysis facilities. **It is often not, however, in the best interests of individual patients**.

*Id.* at 90214, 90215.

194.    The CMS further observed that such "steering" took the form of dialysis providers injecting themselves into their patients' insurance coverage decisions, and that this created a conflict of interest between the dialysis providers financial interests and the treatment and wellbeing of their patients:

> **Comments indicated that dialysis facilities are involving themselves in ESRD patients' coverage decisions and that this practice is widespread**.  In addition, all commenters on the topic – including insurance companies, dialysis facilities, patients and non-profit organizations – stated that they believe **many dialysis facilities are paying for or arranging payments for individual market health care premiums for patients they serve**.

> . . .

> **"[C]omments also documented a range of concerning practices with providers and suppliers influencing enrollment decisions in ways that put the**

**financial interest of the supplier above the needs of the patients . . . .** Based on these comments, HHS has concluded that the differences between providers' and suppliers financial interests and patients' interests may result in providers and suppliers taking action that put the patients' lives and wellbeing at risk."

. . .

[T]he asymmetry between facilities' and patients' interests and information with respect to enrollment decisions creates a high likelihood that a conflict of interest will develop.  Comments submitted in response to the RFI support the conclusion that **this conflict of interest is harming patients, with dialysis facility patients being steered toward enrollment in individual market coverage with third party premium payments, rather than enrollment in the public coverage for which they are likely eligible and which is frequently the better coverage option for them**.

*Id.* at 90214, 90217.

195.    The CMS also explained that dialysis providers were motivated to steer their patients onto private insurance under the ACA because such plans reimbursed the providers at a far greater rate than Medicare or Medicaid for the same treatments:

**All commenters who addressed the issue made clear that enrolling a patient in commercial coverage (including coverage in the individual market) rather than public coverage like Medicare and/or Medicaid is of significant financial benefit to dialysis facilities**.  For example, one comment cited reports from financial analysts estimating that coverage generally pays dialysis facilities an average of four times more per treatment . . . .  A number of other commenters explained that commercial coverage reimburses dialysis facilities at significantly higher rates overall.

*Id.* at 90214.

196.    Moreover, because the cost of the premiums is just a fraction of the increased revenue a dialysis provider received under private insurance, as compared to public coverage, dialysis providers:

have much to gain financially . . . by making a relatively small outlay to pay an individual's premium to enroll in commercial coverage so as to receive a much larger payment for providing an identical set of health care services.  This asymmetry creates strong financial incentive for such providers to use premium payments to steer as many patients as possible.

*Id.* at 90214-15.

197.     The IFR requires, *inter alia*, dialysis facilities that make third party payments for coverage, either directly or through a charity, to inform their patients:  (i) how a patient's access to and cost for ESRD care would be impacted by individual market versus Medicare and Medicaid coverage; and (ii) of potential gaps in coverage of penalties if enrollment in Medicare is delayed.  Dialysis facilities must also disclose information about their premium assistance program, including limitations on that assistance and potential termination if patients switch facilities.

198.     Additionally, the IFR forbids a dialysis facility to make premium assistance payments directly or indirectly through a non-profit entity, unless the patient's insurer has formally agreed to accept such payments for the entire plan year.  In other words, while third-party premium assistance payments are still allowed, their permissibility is entirely dependent on the prior approval of the insurer to whom the payments would be made.  The CMS warned, however, that depending on the IFR's efficacy, it was "considering banning third-party payments altogether when patients have the option of enrolling in Medicare or Medicaid," and that the "agency is asking stakeholders to comment on whether patients would benefit from further restricting premium assistance payments."  Samantha Liss, *Federal regulators take aim at dialysis providers steering patients into private plans*, St. Louis Post-Dispatch (Dec. 15, 2016).

199.     However, as noted by Timothy Jost, a law professor at Washington and Lee University, writing on the Health Affairs blog, the new rule on third party premium assistance payments will "effectively end the practice for most patients" even in the absence of an outright prohibition:

The regulation further requires facilities to disclose to individual market insurers the fact that the facilities are paying premiums, either directly or through charities, and receive assurances from the insurers that the insurer will accept payments throughout the plan year. **The facility may not pay the premiums unless such assurances are received. Since insurers actively oppose third party payments, and since CMS has earlier said that it discourages such payments, this rule is likely to put an end to most third party payments for ESRD treatment**. But CMS states that it is considering an absolute prohibition of third party payments if disclosure proves inadequate to end perceived abuses.

Timothy Jost, *CMS Acts On Premium Payments By Dialysis Facilities, Special Enrollment Period Eligibility*, Health Affairs Blog (Dec. 13, 2016).

## G.      Loss Causation

200.     For the purposes of this section of the Complaint, the term "Defendants" refers only to ARA and the Individual Defendants.

201.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ARA common stock and operated as a fraud or deceit on Class Period purchasers of ARA common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of ARA common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

202.     As a result of their purchases of ARA common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.,* damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused ARA common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $29.21 per share on June 13, 2016.

203.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of ARA's business and future financial prospects.  When the truth about the Company was revealed to the market, the price of ARA common stock fell significantly.  The declines in the price of ARA's common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased ARA common stock during the Class Period.

204.    The declines in the price of ARA common stock after the corrective disclosures (*see* ¶¶ 153, 155, 175, 180) came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in ARA common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

205.    The economic loss, *i.e.,* damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of ARA common stock and the subsequent significant declines in the value of ARA common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**H.    No Safe Harbor**

206.    For the purposes of this section of the Complaint, the term "Defendants" refers only to ARA and the Individual Defendants.

207.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ARA who knew that those statements were false when made.

## I.     Applicability of the Presumption of Reliance:  Fraud on the Market

208.    At all relevant times, the market for ARA common stock was an efficient market for the following reasons, among others:

(a)     ARA common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     As a regulated issuer, ARA filed periodic public reports with the SEC and the NYSE;

(c)     During the class period, ARA's common stock had an average daily volume of 212,525 shares traded;

(d)     ARA regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     ARA was followed by securities analysts employed by several major brokerage firms – including, *inter alia*, Matthew Borsch of Goldman Sachs, Steve Baxter of BofA Merrill Lynch, and Joshua Raskin - Barclays Capital – who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(f)     New material information regarding the Company's performance and prospects was quickly incorporated into the price of ARA's common stock, as demonstrated by the immediate decline in ARA's share price upon the release of the negative information described herein (*see* ¶¶ 153, 155, 175, 180).

209.    As a result of the foregoing, the market for ARA common stock promptly digested current information regarding ARA from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of ARA common stock during the Class Period suffered similar injury through their purchase of ARA common stock at artificially inflated prices and a presumption of reliance applies.

## II.

## ALLEGATIONS PERTINENT TO THE SECURITIES ACT CLAIMS

210.    This section incorporates ¶¶ 30-32, 34-52, 56-62, 63-95, 100-102, 122-26, 129-30, 176-77, but specifically excludes any allegations of fraud or fraudulent conduct.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

211.    On April 20, 2016, ARA filed with the SEC its Form S-1/A registration statement for the April 2016 IPO.  On April 20, 2016, the SEC declared the Form S-1/A, as amended, effective.

212.    On April 22, 2016,  ARA filed with the SEC a prospectus (the "Prospectus") for the April 2016 IPO offering to register for sale 7,500,000 shares of the Company's common stock (exclusive of 1,125,000 shares of the Company's common stock pursuant to an over-allotment option issued to the Underwriter Defendants) at a price of $22.00 per share.

213.    The April 2016 IPO was sold pursuant to the Form S-1/A, as amended, and the Prospectus (jointly referred to herein as the "Registration Statement").   The Registration Statement was negligently prepared and, as a result, contained inaccurate statements of material fact and omitted material information required to be disclosed therein.

214.    Specifically, the Registration Statement failed to disclose known trends, events, demands, commitments and uncertainties that were reasonably likely to have a material effect on the Company's operating results.   These known, but undisclosed, trends, events, demands, commitments, and uncertainties caused the financial information of ARA reported in the Registration Statement not to be necessarily indicative of the Company's future operating results.

215.    Under the rules and regulations governing its preparation, the Registration Statement was required to disclose information called for by Item 303 of Regulation S-K.   *See* 17 C.F.R. § 229.303, *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

216.    Item 303(a) of Regulation S-K required the Registration Statement to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

217.    The instructions to Item 303(a) of Regulation S-K required that the disclosure in the Registration Statement to "focus specifically" on material events and uncertainties known to

management that would cause ARA's previously reported financial information not to be indicative of future operating results, stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

218.    As set forth in the SEC's interpretative guidance to Item 303 of Regulation S-K, it requires not only a "discussion," but also an "analysis" of known material trends, events, demands, commitments, and uncertainties.   In this regard, disclosure of a trend, demand, commitment, event or uncertainty is required when it is reasonably likely that the trend, uncertainty or other event will have a material effect on the company's liquidity, capital resources or results of operations.

219.    The Registration Statement failed to disclose the following material trends, events, and/or uncertainties as follows:   (i) ARA's steering of dialysis patients to ACA commercial plans; (ii) ARA's involvement with AKF, including ARA's contributions to that entity and its assistance to patients applying for grants from AKF; (iii) the amount of its business attributable to patients who were receiving premium payment assistance from AKF; and (iv) the uncertainty of AKF's ability to continue making premium assistance payments in light of the fact that AKF operated in violation of the 1997 Advisory Opinion.

220.    The Registration Statement failed to disclose the reasonably likely material adverse effect on the Company's revenues and operating income from its patient steering efforts and relationship with AKF, especially in light of the fact that AKF operated in violation of the 1997 Advisory Opinion.

221.    In addition, the Registration Statement negligently failed to disclose significant known risks that caused the April 2016 SPO to be speculative or risky.  Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 503 of Regulation S-K, 17 C.F.R. § 229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

222.    The Registration Statement negligently failed to disclose the then-existing (as opposed to potential) key risks, including those associated with: (i) ARA's steering of dialysis patients to ACA commercial plans; (ii) ARA's involvement with AKF, including ARA's contributions to that entity and its assistance to patients applying for grants from AKF; (iii) the uncertainty of AKF's ability to continue making premium assistance payments in light of the fact that AKF operated in violation of the 1997 Advisory Opinion; and (iv) the impact on ARA's performance if there was a disruption in ARA's ability to obtain premium payment assistance from AKF for its patients.

223.    Moreover, Defendants were aware of UnitedHealth's claims prior to the IPO and determined to reserve for those claims on ARA's first quarter financial statements (without disclosing the substantive basis for those reserves).

## COUNT I

### Violation of Section 11 of the Securities Act Against All Defendants
### (except McDonough)

224.    Lead Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 210-23 (including the allegations incorporated by reference in ¶ 210), but specifically excludes any allegations of fraud or fraudulent conduct.  This claim for relief does not sound in fraud.  For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

225.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Subclass against all Defendants.

226.    The Registration Statement for the April 2016 IPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements accurate, and omitted to state material facts required to be stated therein.

227.    Lead Plaintiff acquired ARA common stock pursuant to the Registration Statement, without knowledge of the untruths and/or admissions alleged herein.  Lead Plaintiff and the Subclass sustained damages when the price of ARA common stock declined substantially as the material inaccuracies in the Registration Statement were revealed to the market.  Defendant ARA was the registrant for the April 2016 IPO.  As such, ARA is strictly liable to the Lead Plaintiff and the Subclass under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

228.    The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to Lead Plaintiff and the Subclass.

229.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

230.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

231.     At the time of Lead Plaintiff's purchases of ARA common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiff commenced this action.  Less than one year has elapsed between the time that the securities were offered to the public and the time this action was commenced in this Court. ARA's per share price at the time of the commencement of this claim was lower than the IPO price.

## COUNT II

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants (except McDonough) and Centerbridge

232.   Lead Plaintiff repeats and re-alleges each and every allegations contained in ¶¶ 210-31 (including the allegations incorporated by reference in ¶ 210), but specifically excludes any allegations of fraud or fraudulent conduct and/or motive.  This claim for Relief does not sound in fraud.  For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

233.   This Count is asserted by Lead Plaintiff on behalf of itself and the Subclass against all the Individual Defendants and Centerbridge for violations of Section 15 of the Securities Act.

234.   The Individual Defendants and Centerbridge acted as controlling persons of ARA within the meaning of Section 15 of the Securities Act.  ARA has conceded that, as a result of Centerbridge's majority ownership, ARA was a "controlled company."  *See* Form S-1/A at 51. As of the IPO, Centerbridge had appointed the majority of ARA's directors, and maintained the right to appoint a majority of ARA's directors during the Class Period.

235.   By reason of their ownership interest, senior management positions, and/or directorships at the Company, the Individual Defendants individually, and acting pursuant to a common plan, and Centerbridge had the power to control  and exercised the same to cause ARA to engage in the conduct complained of herein and were therefore control persons of ARA.  By reason of such conduct, the Individual Defendants and Centerbridge are liable pursuant to Section 15 of the Securities Act.

236.     Each of the Individual Defendants and Centerbridge were culpable participants in the violations of Sections 11 of the Securities Act alleged in Counts I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the  April 2016 IPO to be successfully completed.

## COUNT III

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### (Against ARA and the Individual Defendants)

237.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of ¶¶ 210-36.

238.     This Count is asserted against ARA and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

239.     During the Class Period, ARA and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240.     ARA and the Individual Defendants violated §10(b) of the Exchange Act and Rule10b-5 in that they:

(a)      employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ARA common stock during the Class Period.

241.    ARA and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of ARA were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of ARA, their control over, and/or receipt and/or modification of ARA's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning ARA, participated in the fraudulent scheme alleged herein.

242.    The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ARA personnel to members of the investing public, including Plaintiff and the Class.

243.    As a result of the foregoing, the market price of ARA common stock was artificially inflated during the Class Period. In ignorance of the falsity of the statements by ARA and the Individual Defendants, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ARA securities during the

Class Period in purchasing ARA common stock at prices that were artificially inflated as a result of ARA and the Individual Defendants' false and misleading statements.

244.    Had Lead Plaintiff and the other members of the Class been aware that the market price of ARA common stock had been artificially and falsely inflated by ARA and the Individual Defendants' misleading statements and by the material adverse information which ARA and the Individual Defendants did not disclose, they would not have purchased ARA securities at the artificially inflated prices that they did, or at all.

245.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

246.    By reason of the foregoing, ARA and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ARA common stock during the Class Period.

## COUNT IV

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants and Centerbridge)

247.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, with the exception of ¶¶ 210-36.

248.    During the Class Period, the Individual Defendants participated in the operation and management of ARA, and conducted and participated, directly and indirectly, in the conduct of ARA's business affairs. Because of their senior positions, they knew the adverse non-public information about ARA's misstatement of income and expenses and false financial statements.

249.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ARA's financial condition and results of operations, and to correct promptly any public statements issued by ARA which had become materially false or misleading.   Additionally, ARA has conceded that, as a result of Centerbridge's majority ownership, ARA was a "controlled company."  *See* Form S-1/A at 51.  As of the IPO, Centerbridge had appointed the majority of ARA's directors, and maintained the right to appoint a majority of ARA's directors during the Class Period.

250.    Because of their positions of control and authority as senior officers, the Individual Defendants and Centerbridge were able to, and did, control the contents of the various reports, press releases and public filings which ARA disseminated in the marketplace during the Class Period concerning ARA's results of operations. Throughout the Class Period, the Individual Defendants and Centerbridge exercised their power and authority to cause ARA to engage in the wrongful acts complained of herein. The Individual Defendants and Centerbridge were "controlling persons" of ARA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ARA.

251.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ARA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated:  February 1, 2017
        New York, New York

                                KIRBY McINERNEY LLP


                                By: _____
                                Ira M. Press (admitted *pro hac vice*)
                                Andrew M. McNeela (admitted *pro hac vice*)
                                825 Third Avenue, 16th Floor
                                New York, New York 10022
                                Tel: (212) 371-6600
                                Fax: (212) 751-2540

                                *Counsel for Lead Plaintiff Rudman and Lead Counsel for Class*

                                **LAW OFFICES OF MARK BOOKER**

                                Mark Booker, B.B.O. #659957
                                Law Offices of Mark Booker
                                33 Mount Vernon Street, 4th Floor
                                Boston, Massachusetts 02108
                                Tel: (617) 248-1650

                                *Liaison Counsel for Lead Plaintiff Rudman and Class*

78

**CERTIFICATE OF SERVICE**

I, Ira M. Press, hereby certify that on February 1, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Ira M. Press*
Ira M. Press